STATE of Missouri, Plaintiff–
Respondent,

v.

William Nick PAGANO, Defendant–
Appellant.

William Nick PAGANO,
Plaintiff–Appellant

v.

STATE of Missouri, Defendant–
Respondent.

Nos. 17970, 18770.

Missouri Court of Appeals,
Southern District,
Division One.

Aug. 23, 1994.

Edward L. Page, Festus, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

PARRISH, Chief Judge.

William Nick Pagano (defendant) was charged with murder in the first degree, § 565.020.1,[1] (Count I), and armed criminal action, § 571.015, (Count II). Following a jury trial, he was found guilty of murder in the second degree, § 565.021, a lesser included offense of the charge in Count I, *see* § 565.025.2(1)(a), and armed criminal action and sentenced to consecutive terms of imprisonment of 20 years (Count I) and 3 years (Count II).

Defendant thereafter filed a motion for post-conviction relief pursuant to Rule 29.15. It was denied without evidentiary hearing. Defendant appeals the judgment of conviction and the order denying his Rule 29.15 motion. The appeals were consolidated in accordance with Rule 29.15(*l*). This court affirms.

Defendant shot and killed Mark Timothy Todd (also referred to in this opinion as Tim Todd). The shooting occurred in the garage at defendant's residence in Festus, Missouri. According to defendant, Todd had come to defendant's house so that defendant could take him to St. Louis to meet someone he could hire to kill his wife.

Todd was an employee of Scientific Security, Inc. (SSI), a company that provides security services for businesses. He was a vice-president of SSI. Defendant was president of

SSI. The company was owned by defendant's wife. Defendant and Todd were reserve Jefferson County deputy sheriffs.

Todd was killed March 26, 1990. According to taped recordings defendant made of earlier conversations between he and Todd, Todd began discussing plans with defendant in early March 1990, about hiring someone to kill his wife. Over the course of several conversations, defendant inquired whether Todd was seriously considering such a plan and represented to Todd that he had contacted persons who could be hired to kill her.

On the afternoon of March 26, 1990, Todd came to defendant's residence. Defendant told Todd he would need to provide the person they would meet with information about his wife and a picture of her. Todd brought a picture with him. After he arrived at defendant's residence he typed information about her place of employment, her residence and where she visited when she was not working. Todd had previously given defendant $5,000 to use as an initial payment to the person who would be hired.

Defendant and Todd entered defendant's garage to get into defendant's car. The garage had spaces for parking two cars. Only one car was in the garage. Todd entered first. Defendant followed. Defendant told Todd that he had to go back inside his house to set his alarm. When defendant returned he was carrying a shotgun. He fired two shots that struck Todd in the head killing him immediately.

Following the shooting, defendant gave statements to law enforcement officers describing his version of what occurred in the garage. Defendant said Todd was carrying a bottle of mineral water and the typewritten list of information about his wife. Defendant said Todd had a handgun tucked in the waistband of his trousers.

According to defendant, when he returned to the garage with the shotgun, he told Todd he was arresting him. Defendant said Todd screamed, dropped the bottle of mineral water and the list, crouched and moved toward the back of the car parked in the garage. Defendant did not see Todd's hand on the

---

1. References to statutes are to RSMo 1986 unless otherwise stated.

handgun; however, he stated he thought Todd was going over the back of the car or behind the car to take cover and shoot at him.

Four days before the shooting, defendant met with the prosecuting attorney of Jefferson County. He told the prosecuting attorney that Todd had discussed arranging to have his wife killed; that he was trying to dissuade him and to get him to seek psychiatric help. The prosecuting attorney suggested defendant contact the detective division of the sheriff's department and obtain their assistance.

After his discussion with the prosecuting attorney, defendant had a telephone conversation with Sheriff Walter "Buck" Buerger, a personal friend, about Todd's plans. Defendant discussed a plan to assist Todd in obtaining psychiatric help, but if Todd refused, to arrest him. Defendant wanted to handle the arrest, if it became necessary, alone.

Defendant also discussed Todd's remarks about hiring someone to kill his wife with Dr. Gordon Johnson, another personal friend, who was chief medical examiner of Jefferson County and chairman of the Department of Laboratory Medicine at Jefferson Memorial Hospital. He told Dr. Johnson that Todd was using steroids to assist with body building—Todd was 6 feet, 6 inches tall and weighed 250 pounds. Defendant inquired about the effect the use of anabolic steroids might have on a person. Defendant told Dr. Johnson that he had the taped recordings of conversations with Todd and the $5,000 Todd had given him to use to hire someone to kill Todd's wife in a bank safe-deposit box. He gave Dr. Johnson the key to the box. After the shooting, Dr. Johnson gave the key to the sheriff.

The afternoon of March 26 at 1:20 p.m., defendant called the sheriff. He told the sheriff that Todd was coming to his house because he had told Todd they would go from there to St. Louis to meet the person who would be hired to kill Todd's wife. Defendant asked the sheriff, "Should I need you, where can I get you?" The sheriff told defendant he would be at his office.

About 45 minutes later defendant called again. He told the sheriff:

I had to shoot him.

. . . . .

He just won't listen. He tried to turn. He was going to trying [sic] to get behind a car and he was coming up with a gun.

The sheriff asked defendant if he had an ambulance coming. Defendant first said he was going to call one. Then defendant said, "Buck he's dead."

SSI was beneficiary of two "key man" insurance policies that insured Todd's life. One policy was issued in 1985; the second in 1986. Applications for both policies were signed by defendant on behalf of SSI.

The first policy was issued by John Hancock Insurance Company. Its face amount was $500,000. The second was issued by the Prudential Insurance Co. of America. Its face amount was also $500,000, but provided accidental death benefits of $1,000,000.

At the time of his death, Todd had been married sixteen years. He and his wife had two children. He had been involved in an extramarital affair for two and one-half years with Stephanie Pagano, defendant's twenty-year-old daughter. Defendant was aware of the relationship between Todd and Stephanie.

Defendant presents seven points on appeal. The first six are directed to the direct appeal of his convictions. The seventh is directed to the appeal of the order denying his Rule 29.15 motion.

■ Defendant's first point complains the trial court erred in admitting testimony from Sandra Caldwell about an argument between Tim Todd and Stephanie Pagano that occurred two or three weeks before Todd was killed. Defendant contends it was error to admit the testimony because there was no evidence he knew about the argument; that the testimony was irrelevant and prejudicial.

Ms. Caldwell testified:

Q. [By the prosecuting attorney] Had you seen Tim Todd have any sort of confrontations or arguments with anybody in the last two or three weeks of his life?

A. Yes.

Q. And when and where would that have been, approximately?

A. When it was—it was two to three weeks before the 26th, and it was in the mall. It was outside of the gym, in the mall, at the health club.

Q. And who was the argument with?

A. Stephanie Pagano.

Q. And where were you that you could—that you could view this occurring?

A. I was standing inside of the women's gym, and I just saw them out in the mall.

Q. And what sort of—what sort of obstructions, if any, were between you and them? What were you—

A. Looking through?

Q. Yes.

A. Looking through the window. It has a sheer curtain hanging on it. But I went up to the window and looked.

Q. And could you hear what was being said?

A. No.

Q. Could you—would you describe what you could see between the two—

.        .        .        .        .

Q. Ma'am, my question was—would you go ahead and describe what you could view occurring between Tim Todd and Stephanie Pagano?

A. When I looked out the window, I could—I saw Stephanie right up—right up against Tim forcefully, right up against him, and you could tell she was very upset. And she was pointing her finger into his chest, and he was pointing down at her, shaking his finger down at her.

Q. When you say—when you talk about forceful contact, could you elaborate a little more on what you mean by that?

A. She was up—pushing up against him like this, pointing to him like this.

Q. Do you have any idea about how long that lasted while you were watching?

A. Five minutes.

Q. And did you see—did you see the ending as far as them going their separate ways, or did you quit watching?

A. They left together.

The state argues that the testimony was relevant to show defendant had a motive for killing Todd; that the killing was not, as defendant claimed, the product of a lawful arrest by a law enforcement officer or lawful self-defense.

The state's position in this appeal is the same as was stated by the special prosecutor in closing argument:

The prosecutor just has to prove that some level of homicide occurred—and you had the jury instruction read to you in each of those levels of homicide—and that it was not self-defense, and it was not a justified use of force by a law enforcement officer making an arrest. The prosecutor does not have to prove motive.

And in this case, it is a good thing the prosecutor doesn't have to, because I submit to you there is no way twelve people could unanimously agree on what the motive was in this case. I can think of at least five motives. The jury may be able to think of more.

For example, one would be that William Nick Pagano was furious with Tim Todd, and—because Tim Todd was not wanting to marry his daughter. That's one possible motive.

Two, he was furious with Tim Todd because he wanted them to break up. He didn't want Tim Todd around his daughter anymore.

A third possible motive is that there is some other pain that Tim Todd had caused Stephanie Pagano that Pagano was furious about.

A fourth motive could be the 1.5 million dollars in life insurance payable to SSI. That's 1.5 million reasons why he might want him dead.

And a fifth motive, that it could be that whatever argument they had in that garage, that we will never know the exact details of, whatever argument was going on, had indicated to William Nick Pagano that he could no longer rely on Tim Todd,

that Tim Todd was going to be a threat to him and he had to seal his lips and end his life right then.

Defendant relies on *State v. Willis*, 632 S.W.2d 63 (Mo.App.1982), in contending Ms. Caldwell's testimony about the quarrel between Tim Todd and Stephanie was irrelevant. He contends it was irrelevant because there was no evidence that defendant knew about that particular quarrel. In *Willis*, the state asserted that the defendant's motive to kill the victim was to collect the proceeds of an insurance policy on the victim's life, but offered no evidence that the defendant in that case knew of the existence of the life insurance policy. The court held that evidence about the policy was improper under those circumstances. *Id.* at 66.

In *Willis*, the existence of the insurance policy was the claimed motive. In this case, the fact that the argument occurred that Sandra Caldwell observed was not asserted as a motive. The fact that Stephanie and Todd's relationship was "stormy" was a factor in establishing motives suggested by the state. The fact that the quarrel occurred was corroborative of a stormy relationship.

█ For evidence to be relevant, it needs only to logically tend to prove a fact in issue or to corroborate other relevant evidence which bears on a principal issue. It need not be conclusive. *State v. O'Neal*, 718 S.W.2d 498, 503 (Mo. banc 1986), *cert. denied*, 480 U.S. 926, 107 S.Ct. 1388, 94 L.Ed.2d 702 (1987); *State v. Richardson*, 838 S.W.2d 122, 124 (Mo.App.1992).

Defendant knew of the relationship between Todd and Stephanie and knew it had sometimes been stormy. In a statement to a law enforcement officer after the shooting, defendant acknowledged that Todd and Stephanie quarreled. Defendant told of a quarrel over whether Stephanie should stay in school. He also told of an altercation between Stephanie and Todd at a movie theater.

The fact that Stephanie Pagano's and Tim Todd's relationship remained "stormy" two or three weeks before Todd was killed could be considered by the jury in assessing defendant's relationship with Todd at the time Todd was killed. *See State v. Stapleton*, 518 S.W.2d 292, 296–97 (Mo. banc 1975). This is particularly true in view of other evidence of an argument between defendant and Todd the day before Todd was killed.

Crystal Stewart testified that she observed an argument between defendant and Todd the day before Todd was killed; that she overheard defendant curse Todd and say, "It's got to stop," and, "I'll get you for this." Ms. Stewart testified that Todd replied, "She's a grown woman." A jury could infer that the woman Todd referred to was twenty-year-old Stephanie; that defendant was upset with Todd over his relationship with her.

█ Defendant contended he killed Tim Todd in self-defense. He claimed he had a long-standing "very close relationship" with Todd. He relied on the existence of such a relationship in contending that, absent attempting to subdue Todd for Todd's own protection or acting in self-defense, he would not have shot Todd. Although motive is not an element of the offense charged, under those circumstances, motive became important. *See State v. Stapleton, supra*. Motive is an evidentiary circumstance a jury may consider. *State v. Crabtree*, 625 S.W.2d 670, 675–76 (Mo.App.1981). Motive tends to discredit claims of justification. *Id.* at 676. *See also State v. Newbold*, 731 S.W.2d 373, 382 (Mo.App.1987). Evidence of motive was, therefore, relevant. *State v. DeWeese*, 751 S.W.2d 389, 393 (Mo.App.1988).

█ "The trial court has broad discretion to determine relevancy of evidence and an appellate court will not reverse such a decision absent a clear showing of abuse of that discretion." *Id.* This court finds no abuse of discretion by the trial court in allowing Ms. Caldwell's testimony. Point I is denied.

█ Defendant's second point is directed to the prosecuting attorney's suggestion in closing argument that the "key man" life insurance policies on Todd's life could be a motive for defendant to have killed Todd. Defendant contends that he did not get a fair trial because the state breached "the stipulation of the parties that [defendant] had no ownership, directly or indirectly, in the cor-

poration to which the proceeds of insurance in the amount of 1.5 million dollars would be paid"; that the state, by "arguing to the jury that the insurance money was a motive to kill Todd and that the proceeds would go to defendant's company," violated a stipulation of the parties that was admitted in evidence.

Arguably, Point II does not comply with requirements of Rule 30.06(d) in that it fails to "state briefly and concisely what actions or rulings of the court are sought to be reviewed." *State v. Hicks,* 803 S.W.2d 143, 148 (Mo.App.1991); *State v. Maxson,* 755 S.W.2d 277, 281 (Mo.App.1988). Point II does not complain of any action or ruling by the trial court. Further, the transcript does not reveal any objection at trial to the argument about which defendant now complains.

Defendant apparently intends Point II to assert trial court error in failing, *sua sponte,* to preclude the prosecutor from arguing that the existence of the life insurance constituted a motive for defendant to kill Todd. That being discernible from the argument portion of the brief, the issue will be reviewed for plain error. "Plain error is found only when the court determines that 'manifest injustice or a miscarriage of justice has occurred.'" *State v. Meder,* 870 S.W.2d 824, 831 (Mo.App. 1993), *quoting State v. McMillin,* 783 S.W.2d 82, 95 (Mo. banc), *cert. denied,* 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990). *See* Rule 29.12(b).

The substance of the prosecutor's argument was readily before the jury. The stipulation disclosed the insurance and that defendant signed the applications for the two policies on behalf of SSI. It also disclosed that defendant's wife owned SSI and that he and his wife continued to live together. Defendant was president of SSI. It could reasonably be argued that he would benefit from SSI receiving 1.5 million dollars either in his capacity as president of the company, or, indirectly, as the spouse of the company's

owner. This court finds no error, plain or otherwise. Point II is denied.

■ Point III is also directed to statements made by the prosecutor in closing argument. It states, "[Defendant] was denied a fair trial by the state's improper and prejudicial argument that the jury should convict [defendant] so as to send a message to the wealthy and in effect urging the jury to convict [defendant] because he was wealthy, which argument was prejudicial plain error."

Point III also violates Rule 30.06(b). It is not directed to an action or ruling by the court. Likewise, no objection was made to the argument at trial. Defendant appears cognizant of the lack of objection at trial in that he seeks only review for plain error.

The prosecutor's statements about which defendant complains are:

And the message needs to be sent that no matter who you are, no matter how much money you have, no matter who you know, you can't get away with murder.

. . . . .

[You know, William Nick Pagano is an example of what is wrong with law enforcement in some parts of the country, and, in particular, in Jefferson County, Missouri.][2] This notion that whether you are going to be arrested, whether you are going to be prosecuted, whether you are going to be convicted of a crime, depends on who you are, who you know, how much money you have.

. . . . .

And the fifth thing I wanted to point to your attention on that issue was, Bill Pagano shoots a man in the back of the head. He shoots him a second time when he is lying on the ground. Is he going to be prosecuted and convicted for murder? Not if his friend, the lord high sheriff, has anything to say about it.[3]

---

**2.** This and other words included in brackets with the material about which defendant complains are included because they give meaning and understanding to the sentences that immediately follow. Defendant did not include the words in brackets with the parts of the closing argument with which he finds fault.

**3.** Defendant used the term "lord high sheriff" to refer to Sheriff Buerger in a tape-recorded conversation between him and the sheriff.

[Bill Pagano, I submit to you, has been a big frog in a small pond of Jefferson County, making big contributions to all the politicians, getting his way on everything. And I submit to you that he thinks money and connections of who you know and connections of who you are, can buy you anything, including murder, including the death of a man that had been working for him.]

.     .     .     .     .

And what needs to be done is, you need to look at the facts and send a message in this case. That message is that no matter who you are, no matter how much money you have, no matter who you know, you can't get away with murder.

.     .     .     .     .

Because with a life sentence here, you can send a message, the message that no matter who you are, no matter how much money you have, no matter who you know and what connections you have, you can't get away with murder.

Defendant, in his appellant's brief, asserts, "The argument of the Special Prosecutor was purposeful to bias the jury against the Defendant because he was rich and influential which in this day and age is not a position of public admiration. The argument was not an argument for the need of law enforcement or for honest law enforcement. The argument was a 'get the rich' argument."

This court does not agree. The jury heard tape-recorded statements of defendant from interviews conducted by a deputy sheriff who helped investigate the case in which defendant acknowledged attempting to use political influence to obtain favors. He told the deputy sheriff of having assisted Tim Todd in obtaining an SBA loan through a congressional contact. ("He wasn't gonna get that S.B.A loan for that gym until I twisted a congressman's arm to intercede on his behalf.")

The jury heard other testimony about defendant's involvement with elected officials. There was evidence that defendant tried to give a political contribution to the prosecuting attorney of Jefferson County four days before Tim Todd was killed—the prosecuting attorney declined the tendered contribution. There was evidence that defendant had previously promised to have friends make contributions to the prosecuting attorney; that he had given contributions to other county office holders, including political rivals in one election. He contributed to local and state candidates of both political parties.

In the tape-recorded statement defendant gave the deputy sheriff, he stated he had used his influence to help the medical examiner, the sheriff, the prosecutor "or any of those type of people to obtain a job." He told of contributing to the "county court" members. He stated, "And before all this happened I probably had about as much influence on things like that around here as most anybody else did, you know? I don't know how much I got any more but. . . ."

The jury also heard testimony alluding to financial affluence of defendant's family. There was testimony that in 1990 SSI, the company that defendant's wife owned and defendant ran, had gross revenues of 4.5 million dollars and profits of about $220,000.

The part of the state's closing argument about which defendant complains was based on evidence that was before the jury. The prosecutor's argument, considered in the context of the evidence, was that defendant's usual mode of behavior was to use political and personal contacts to get what he wanted; that in keeping with that pattern, defendant attempted to use those same connections to circumvent the law. The prosecutor's closing argument stated conclusions that could reasonably be inferred from the evidence. As such it was permissible. *State v. Cobb*, 820 S.W.2d 704, 711 (Mo.App.1991). Point III is denied.

■ Point IV asserts the trial court erred "when it allowed, over objection, the prosecutor during closing argument to improperly advise the jury as to the law, by inaccurately stating that the law and instructions required that in the jury's consideration of the degree of the offense and lesser included offenses the jurors must first unanimously find the defendant not guilty of murder in the first degree before they could even consider murder in the second degree, and manslaughter."

During closing argument, the prosecutor told the jury:

> You know, there are three levels of homicide that the Judge has read to you: first-degree murder, second-degree murder and voluntary manslaughter. And as you heard when the Judge read the jury instructions, in Missouri you start out with first-degree murder and work your way down. And, significantly, you start with first-degree murder and you don't even consider second-degree murder or manslaughter unless you unanimously find he is not guilty of first-degree murder. So you start with first-degree murder, and you don't even go down to second-degree [murder] or voluntary manslaughter unless you unanimously find he is not guilty of first-degree murder.

When defendant's attorney posed his objection, he said only, "That's a misstatement of the law." His remark was followed by a brief exchange between he and the prosecutor over the meaning of the beginning paragraphs of Instructions No. 8 and No. 10.[4] The exchange ended with defendant's attorney proclaiming, "Excuse me. I have an objection." The trial judge responded, "Excuse me. The instructions themselves will speak for themselves. You may go on."

A similar circumstance occurred in *State v. McIlvoy*, 629 S.W.2d 333 (Mo. banc 1982). In *McIlvoy*, the prosecutor complained in closing argument about the availability of a defense of diminished capacity under § 562.-076.1(1), RSMo 1978, a defense relied upon by that defendant and instructed upon by the court. The attorney who represented the defendant objected saying, "I will object to that. That is disparaging a legal defense. I ask that the Jury be instructed to disregard it." *Id.* at 340.

The trial judge in *McIlvoy* responded, "The jury will be guided by the instructions of the Court, which they will take with them to the jury room and the evidence that they

heard from the witnesses, together with the other items introduced into evidence." *Id.*

On appeal, the supreme court determined that, technically, the defendant's objection "was 'not expressly ruled' upon"; however, it was evident that the trial court's direction to the jury was in response to the request that the jury be instructed to disregard the prosecutor's remark. The supreme court pointed out that the defense attorney did not request a mistrial; that defendant "was granted all of the relief which he requested." *Id.* The court held that nothing was preserved for appellate review.

Here, the trial court responded to defendant's complaint that the prosecutor misstated the law by telling the jury that the instructions that had been read spoke for themselves. Defendant requested no other relief. As in *McIlvoy*, nothing was preserved for appellate review.

■■■ This court, nevertheless, has considered the issue defendant posed in Point IV for plain error. Statements made during closing arguments do not amount to plain error unless they are determined to have had a decisive effect on the jury. *State v. Davis*, 566 S.W.2d 437, 447 (Mo. banc 1978). To have a decisive effect, there must be a reasonable probability that without what is deemed as improper argument, the verdict would have been different. *State v. Roberts*, 838 S.W.2d 126, 132 (Mo.App.1992).

The jury found defendant guilty of the lesser included offense of murder in the second degree. Its verdict was required to be unanimous. It was not required to consider whether defendant was guilty of manslaughter if it found him guilty of murder in the second degree. The argument about which defendant complains obviously had no decisive effect on the jury. This court finds no plain error. Point IV is denied.

■■■ Point V is directed to the trial court's denial of defendant's request for mis-

---

4. Instructions No. 8 and No. 10 are patterned after MAI–CR3d 313.04 and 313.08. The beginning paragraph of Instruction No. 8 states, "As to Count I, if you do not find the defendant guilty of murder in the first degree, you must consider whether he is guilty of murder in the second

degree." The beginning paragraph of Instruction No. 10 states, "As to Count I, if you do not find the defendant guilty of murder in the second degree, you must consider whether he is guilty of voluntary manslaughter."

trial and its refusal to dismiss juror Yvonne Mullins during the course of the trial. Defendant contends the trial court erred in not dismissing Ms. Mullins "because she had been tainted by the statement of alternate juror Brenda Todd in which Todd expressed her opinion that the case was cut and dried and indicated she believed [defendant] was guilty." Defendant contends he was denied a fair trial because the jury who found him guilty included the persons who heard the improper remark.

While in recess during trial, several jurors overheard Brenda Todd say that she thought the case was "pretty cut and dried." Jurors who heard the remark reported it to the bailiff. The trial court dismissed Ms. Todd and questioned the remaining jurors about whether statements had been made about the case in their presence. The trial court's inquiry was made on the record, outside the presence of the attorneys. The trial court determined that the jurors other than the alternate juror who made the remark could remain fair and impartial and continue their jury service.

Four jurors heard Brenda Todd's statement. Three stated that she did not say which way she believed the case should be decided. The fourth, Ms. Mullins, understood that Ms. Todd believed defendant was guilty. However, in response to the trial judge's questions, Ms. Mullins stated she wanted to make up her own mind; that the statement she heard did not influence her one way or the other; that she could base her opinion solely on the evidence and the instructions of the court.

The other three jurors who heard the statement indicated that their abilities to decide the case were not affected; that they could base their decisions on the evidence and the instructions of the court.

Defendant moved to strike all the jurors who heard the alternate juror's remark, specifically including Ms. Mullins, and requested mistrial. In challenging Ms. Mullins, defendant pointed to Ms. Mullins' understanding that the person who made the remark be-

lieved defendant was guilty, and, apart from the challenge to the other jurors, based the request to excuse her on this additional factor. The trial court denied defendant's motion to strike the jurors and the request for mistrial.

In *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), the court acknowledged the virtual impossibility of "shield[ing] jurors from every contact or influence that might theoretically affect their vote." *Id.* at 217, 102 S.Ct. at 946. It held, "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Id.* It concluded, "[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation." *Id.*

The record reveals no abuse of discretion by the trial court in denying defendant's motion to strike juror Mullins and request for mistrial.

■ Although defendant did not include any complaint in Point V about the procedure the trial court followed in inquiring of the jury, the argument that follows includes the statement, "The trial court failed to afford the Defendant an opportunity to explore, through interrogation of the jurors and alternate juror Todd herself, the poisoning, the tainting, the implanting of bias, and the prejudice resulting from the clearly established misconduct." He concluded, "It is now too late to do so and the only remedy, in order to insure a fair trial, is to reverse and remand for a new trial."

■ Questions for decision on appeal are those stated in points relied on. A question not presented in that manner is not an issue for appellate review. *McCoo v. State*, 844 S.W.2d 565, 567–68 (Mo.App.1992).[5]

This court finds no error in the trial court's denial of defendant's motion to strike

**5.** Defendant's attorney did not assert a lack of opportunity to interrogate jurors as error in defendant's motion for new trial. In addition to

not being presented on appeal, the issue was not preserved for appellate review. *State v. Crenshaw*, 852 S.W.2d 181, 185 n. 4 (Mo.App.1993).

juror Mullins and request for mistrial. Point V is denied.

◾ Point VI contends the trial court erred in overruling defendant's objections to testimony of Patricia Todd about statements her husband, Tim Todd, made two months prior to his death that defendant threatened to kill him unless he married defendant's daughter and that he feared defendant. Defendant contends the testimony was hearsay and was improperly argued for purposes other than those for which they were admitted in evidence.

Mrs. Todd testified:

Q. [By the special prosecuting attorney] On that situation in January where you had met [Tim Todd] in the parking lot and spoke, could you relate to the jury that conversation, please?

. . . . . . .

Q. Go ahead and answer the question.

A. That day after work he met me on the back parking lot by my car, and he told me that he didn't want to divorce me, but if we were to live in Jefferson County he was told by Bill Pagano that he had to— that he would marry his daughter, Stephanie Pagano, and if he did not that he would kill him.

Q. That who would kill who?

A. Bill Pagano would kill Tim.

Q. And Tim told you this when?

A. It would have been around January 16—about 18th of 1990.

Q. And can you describe the way he looked as he was telling you this?

A. Yes. He was very pale and upset.

The prosecutor referred to Mrs. Todd's testimony in closing argument:

When Bill Pagano was in that garage pointing a 12–gauge shotgun at him—recall that Tim Todd was afraid of Bill Pagano. Remember, he told his wife in January that he was afraid Bill Pagano would kill him if he didn't marry Pagano's daughter, Stephanie. He was afraid of Pagano. And Pagano is pointing a shotgun at him and he has his gun in his waistband and a can of mineral water in one hand and a piece of paper in the other. He is not going to try to go for a gun against somebody who has already got a shotgun leveled at him. He is not going to do that.

. . . . .

But the State of Missouri did not have the right to give Tim Todd the death penalty for conspiracy to commit murder, nor did William Nick Pagano have the right to commit murder when William Nick Pagano took it upon himself as judge, jury and executioner of Tim Todd; the judge, jury and executioner of the man who had been having an affair with his daughter; the judge, jury and executioner of the man to whom the very day before Pagano had said, "I am going to get you"; the judge, jury, and executioner of the man that— Tim Todd—Tim Todd, who had told his wife he was afraid Bill Pagano was going to kill him.

. . . . .

You know, he had been afraid of Bill Pagano. He had told his wife in January that he was afraid Pagano was going to kill him. Pagano, that day before, had been poking him in the chest, saying, "I am going to get you."

◾ Declarations of a decedent in a homicide case are admissible to prove the decedent's state of mind where that is relevant. *State v. Singh,* 586 S.W.2d 410, 417 (Mo.App.1979); *see also State v. Boliek,* 706 S.W.2d 847, 850 (Mo. banc), *cert. denied,* 479 U.S. 903, 107 S.Ct. 302, 93 L.Ed.2d 276 (1986). "[T]he courts have developed three rather well-defined categories in which the relevancy of such statements of fear is established. These include cases involving defenses of self-defense, suicide of the decedent, and accidental death." *Singh, supra,* 586 S.W.2d at 419, *citing U.S. v. Brown,* 490 F.2d 758 (D.C.Cir.1973).

Defendant contended he shot Todd in self-defense. The victim's prior statements were admissible to show his state of mind as it related to defendant. That state of mind was relevant to explain Todd's actions. Upon seeing defendant with a shotgun, if Todd were fearful of him, he would have likely attempted to flee. Defendant shot Todd two

times in the back of the head. The trial court did not err in admitting the testimony of Mrs. Todd regarding the statements her husband had made expressing fear of defendant. Point VI is denied.

■ Point VII is directed to the trial court's denial of defendant's Rule 29.15 motion without an evidentiary hearing. Defendant contends the trial court erred in dismissing the motion without an evidentiary hearing because "there [were] issues of fact not resolved by the files and records of the court, including whether trial counsel's failure to object to prejudicial and improper arguments were trial tactics or because of other reason amounting to prejudicial ineffective assistance of counsel."

Defendant's claim of ineffective assistance of trial counsel is directed to his trial counsel's failure to object to the prosecutor's statements in closing argument that a motive for defendant to have killed Todd might be the life insurance proceeds that would be paid to his company, and the jury should send a message that by finding defendant guilty no one was above the law because of personal wealth or influence. This court found, in regards to the direct appeal, that these arguments were permissible. Counsel cannot be found ineffective for failing to make a non-meritorious objection. Point VII is denied.

The judgment of conviction and sentence in No. 17970 are affirmed. The order denying defendant's Rule 29.15 motion in No. 18770 is affirmed.

SHRUM and MONTGOMERY, JJ., concur.