STATE of Missouri, Plaintiff–
Respondent,

v.

Harry HIGHTOWER, Defendant–
Appellant.

No. 21183.

Missouri Court of Appeals,
Southern District,
Division Two.

Sept. 5, 1997.

Ellen H. Flottman, Asst. Public Defender, Columbia, for defendant-appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Gregory L. Barnes, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

PARRISH, Judge.

Harry Hightower (defendant) was convicted following a jury trial of robbery in the first degree, § 569.020,[1] (Count I), armed criminal action, § 571.015, (Count II), and tampering in the first degree, § 569.080.1(2), (Count III). This court affirms.

One of defendant's challenges on appeal is directed to the sufficiency of the evidence. When reviewing for sufficiency of evidence, appellate courts accept as true all evidence favorable to the state, including all favorable inferences drawn therefrom, and disregard all evidence and inferences to the contrary. *State v. Dulany,* 781 S.W.2d 52, 55 (Mo. banc 1989).

Town & Country Grocery Store is located in Charleston, Missouri. On the evening of

---

1. References to statutes are to RSMo 1994.

October 26, 1995, an office worker, Robin Slaten, packaged the store's money so it could be taken to First Financial Bank. She prepared two bank bags. She placed cash in a bag she described as "the drop bag" and food stamps and checks in another bag she called "the deposit bag." Deposit slips were included in the deposit bag "[b]ecause that's what's deposited." The drop bag included "packaged" cash and cash used to make change for customers.

Ms. Slaten told the jury, "We have two drawers. One has packaged money at the bottom, and then the top is what we use for change for the customers when they come in." Ms. Slaten would put the packaged money and the cash that was used for change in the drop bag at the end of the evening. She explained, "It's cash that we've brought in for the night that we take over and just pick up the next day."

Ms. Slaten estimated that the drop bag contained between $3,500 and $3,800 the evening of October 26. The packaged cash was wrapped in $100 bundles containing bills of the same denomination. She explained:

Q. [by the prosecuting attorney] Now, tell the jury, if you can, how that money would appear physically.

A. They would have been in bundles of $100s, with rubber bands or paper clips around them.

Q. All right. Now, bundles of $100s. Let's go a little more systematic than that. Tell me about the $1 bills. How would they be packaged?

A. They're packaged $25, with a rubber band around them or paper clip, and then four—four bundles would be—make $100. And then they get rubber banded around them.

Q. All right. Now, what about the $5 bills?

A. They're packed in $100—$100s, and there would be five bundles of them. And then they would be rubber banded.

Q. Okay. So you're talking in terms of twenty $5 bills would be $100?

A. Yes.

.       .       .       .       .

Q. Tell me about the $10 bills.

A. They're in bundles of $100s. They're paper clipped or rubber banded. And then five bundles make $500, with a rubber band around them.

Q. Okay. And what about the $20 bills?

A. They're bundled in $500, with rubber band around them and—or paper clipped. And then two bundles would have made $1,000, wrapped around.

Q. And that's the $20 bills. Do you recall on the night of the 26th if there were any other bills of other denominations?

A. I remember having four $50 bills that night.

The night manager who was working the evening of October 26 was Clifton Cossey. He closed the store that evening. He prepared to take the drop bag and the deposit bag to First Financial Bank. The bank was across the street from Town & Country Grocery Store.

Mr. Cossey and another employee, Larry Jones, took the bags in Cossey's truck. In accordance with store policy, a third employee, Michael Bankhead, followed them to the bank. When Cossey and Jones pulled into the bank parking lot, a man jumped from behind a wooden barrier that was around a dumpster in the lot. He had a sawed-off shotgun. The man pointed the shotgun at Cossey and Jones and told them to get out of Cossey's truck. He told Cossey to get out or he would shoot. When Cossey and Jones got out of the truck, the man got in the truck and drove off with the bank bags.

About 15 minutes after the robbery occurred, Charleston police officers Anthony Moody and Kelly Brown were sitting in a patrol car when they observed a light blue two-door automobile pass in front of them. The officers watched the car as it approached an intersection. The car ran a stop sign. As the car turned a corner, it was sideways in the road. The officers turned on their red lights and pursued the car until it pulled into a driveway and stopped.

When the car stopped, the driver, later identified as Woodrow Anderson, jumped out of the car and began to walk away. Officer Moody observed a large knife sticking out of

Anderson's back pocket. He ordered Anderson to stop and get on the ground. Anderson continued walking. Officer Moody again ordered Anderson to stop and get down on the ground. Anderson complied. Officer Moody removed the knife from Anderson's back pocket, then brought Anderson back to the vehicle and had him put his hands on the hood of the car.

Officer Brown got out of the patrol car and approached the passenger side of the stopped car. Defendant was in the car. Officer Brown told defendant to get out and put his hands on top of the car. When defendant got out of the car, Officer Brown took hold of one of his arms. Defendant broke loose and ran. Officer Brown chased defendant. He explained, "As I was catching up with him, apparently he fell and ended up in a lot—half of his body was in a lot, tall grass, the other half was in the street. And that's when I caught up with him."

Defendant was arrested and handcuffed. He was taken back to the car. Officer Brown then returned to where defendant had fallen. He found an orange hat and a large amount of cash. Officer Brown explained:

Q. [by the prosecuting attorney] Now, you said you observed an orange cap. Was that [defendant's] cap?

A. Yes, ma'am, it was. He was wearing it during the foot pursuit. It fell off his head as he fell.

Q. Did he have it on his head when he got out of the vehicle?

A. Yes, ma'am, he did.

Q. And you saw him take off running with that hat on?

A. Yes, ma'am, I did.

Q. And when you handcuffed and picked him up, he had lost the hat?

A. Yes, ma'am.

Q. You—Well, exactly how did you find this currency? Do you remember?

A. I—Yes, ma'am, I do remember.

Q. How was it?

A. It was underneath the hat. It was in bundles of $20s, $5s, $10s, et cetera.

The amount of cash recovered with defendant's hat was $1,924. Woodrow Anderson had an additional $1,933 at the time he was arrested.

A short time after defendant and Anderson were arrested, police officers found Mr. Cossey's truck. It had been abandoned a short distance from the bank. Two footprints were found nearby, one beside the truck and one about eight feet from the truck. The officers covered the footprint nearest the truck to protect it from rain.

The next morning Charleston Police Lieutenant Robert Hearnes made a plaster cast of the footprint beside the truck. The tread was from a Nike tennis shoe. The cast was compared to the bottoms of Nike tennis shoes defendant was wearing when he was arrested. Lt. Hearnes testified that the footprint appeared to have been made by a shoe the same size as those defendant was wearing. The footprint showed the same type of tread as defendant's shoes.

■ Defendant's first allegation of error asserts the trial court erred in denying defendant's motions for judgment of acquittal at the close of the state's case and at the close of all the evidence and in imposing sentence for the three offenses for which he was tried.[2] Defendant contends the state failed to produce sufficient evidence for the jury to have found him guilty of the robbery of the Town & Country Grocery Store.

■ Defendant argues the evidence was insufficient because he was not positively identified as the robber; that the testimony at trial was only that he "looked like" the robber who was described as a tall, black man. He contends the evidence that he ran away from the police after the car was stopped; that he was carrying bundles of

**2.** Defendant attempts to direct his allegation of trial court error to motions for judgment of acquittal made at the close of the state's case and at the close of all evidence. Defendant presented evidence in his own behalf. In doing so he waived any claim of error he could have directed to the denial of the motion at the close of the state's case. *State v. Purlee,* 839 S.W.2d 584, 587 (Mo. banc 1992). The only question for review on appeal with respect to the trial court denying motions for acquittal is whether it was error to deny the motion for acquittal made at the close of all evidence. *State v. Wright,* 934 S.W.2d 575, 580 (Mo.App.1996).

money in his cap, packaged the way the grocery store packaged cash, totaling about half the amount of cash taken in the robbery; that his footprint was similar to the one found near the abandoned truck are circumstances that are suggestive, but that they are not sufficient to prove his guilt beyond a reasonable doubt.

Clifton Cossey told the jury defendant fit the description of the robber. He explained, however, that he was "[n]ot 100 percent sure" defendant was the robber; that the robber had a hat on; "he had a stocking over his face and he had a mustache and a goatee." The jury was told that defendant ran from the car in which he was a passenger when the car was stopped by police; that when defendant fell his hat came off; that the hat had more than $1,900 in currency inside. The jury learned that the other occupant of the car, its driver, also had more than $1,900 cash. It knew that the amount of cash recovered from defendant and his companion corresponded with the estimated amount of cash taken in the robbery. The jury knew defendant was wearing tennis shoes when he was arrested that had the same type of tread on the soles as the footprint alongside the truck that the robbers took from the robbery scene.

It is the jury's role, not an appellate court's, to weigh the evidence. *State v. Carey*, 914 S.W.2d 406, 407 (Mo.App.1996). The jury was convinced beyond a reasonable doubt that defendant committed the robbery and, concurrent therewith, committed the offenses of armed criminal action and tampering in the first degree. This court will not disturb jury verdicts of guilty so long as the evidence meets the minimal appellate standard required by due process, *viz*, that a reasonable juror, relying on the evidence adduced, could find defendant guilty beyond a reasonable doubt. *State v. Grim*, 854 S.W.2d 403, 406 (Mo. banc), *cert. denied*, 510 U.S. 997, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993). Having reviewed the evidence, this court concludes it was sufficient to have enabled a reasonable juror to find defendant guilty of the offenses charged. Defendant's first point is denied.

■ Defendant's second point is directed to the testimony of Larry Jones, the passenger in Clifton Cossey's truck when he was robbed. Mr. Jones' testimony included:

Q. [by the prosecuting attorney] You were already out of the truck while Clifton was still trying to get out; is that correct?

A. Yes.

Q. And what was going through your mind at that point, Larry?

A. What was going through my mind at that point? Sammy.

Q. I'm sorry?

A. Sammy.

Q. What's that?

A. Sammy Harris. The last time the store got robbed, he didn't quite make it out that time.

Mr. Jones was then asked, "Now, tell this jury about Sammy Harris. What happened to him." Defendant's trial attorney objected on the grounds of relevancy. The trial court sustained the objection. Mr. Jones' testimony continued:

Q. Were you afraid?

A. Yes. Yes.

Q. And why were you afraid?

A. Afraid for my life, based on my friend.

Q. Did the—Did the man that held the shotgun on you looked [sic] like he planned to use it?

A. Yes, he did.

Defendant's trial attorney then objected to the question about whether the robber looked like he planned to use the shotgun. The objection was overruled.

Defendant's point on appeal asserts:

The trial court plainly erred in permitting the prosecutor to ask Larry Jones about his fear of the robbery due to "what happened to Sammy Harris" because this prosecutorial misconduct violated [defendant's] rights to due process of law and a fair trial, ... in that the prosecutor injected into the minds of the jurors irrelevant matters which were not proper for their consideration and played on their fear and collective memories of the murder of Sammy Harris.

Defendant did not object at trial to the testimony of Mr. Jones about which he complains on appeal. "Unless specific objections are made at trial when questions are asked and answers given, issues presented by that testimony are not preserved for appellate review." *State v. Williamson*, 836 S.W.2d 70, 72 (Mo.App.1992). Defendant's Point II alleges the trial court "plainly erred" in this respect, apparently in recognition that plain error review is the only review as permitted by Rule 30.20 the issue may receive.

"The plain error rule does not justify a review of every point that has not been properly preserved for appellate review." *Gooden v. State*, 846 S.W.2d 214, 216 (Mo.App. 1993). *See also State v. Ervin*, 835 S.W.2d 905, 920 (Mo. banc 1992), *cert. denied*, 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993); *State v. Wright*, 934 S.W.2d 575, 584 (Mo.App.1996), *citing State v. Silvey*, 894 S.W.2d 662, 670 (Mo. banc 1995); *State v. Guidorzi*, 895 S.W.2d 225, 231 (Mo.App. 1995). Mindful that an appellate court will not reverse a case based on a trial court's ruling on an evidentiary question unless there is substantial or glaring injustice, *Ellis v. Jurea Apartments, Inc.*, 875 S.W.2d 203, 209 (Mo.App.1994), and that the meaning of matters to which Mr. Jones alluded in the challenged testimony, the occurrence involving Sammy Harris, must be found outside the record in this case, this court declines to grant plain error review.[3] Defendant's second point is denied.

■ Defendant's third point alleges the trial court "plainly erred" in overruling objections to questions asked defendant on cross-examination by the state. The questions were directed to prior convictions of defendant. Defendant testified on direct examination that he had pleaded guilty to three misdemeanor offenses of assault in the third degree.

On cross-examination defendant volunteered the statement that he ran when the car in which he was a passenger was stopped because he was on probation and was afraid he would be put in jail; he was afraid of "having to do a year." The prosecutor then asked, "You—Well now, that didn't seem to stop you too much in Cape Girardeau County when you were on probation and went out and committed other crimes, now; did it?" Defendant replied, "I didn't commit no crimes. That was my wife and kids."

A series of questions and answers followed in which defendant stated he had pleaded guilty to offenses originating from a domestic disturbance with his wife because he "didn't want to fight it." A colloquy followed in which the prosecutor suggested, "Okay. Now, you were lying to the Court then when you swore to tell the truth. What are you doing now?" Defendant answered, "I'm telling you what happened." The prosecutor replied, "You're telling me the truth, but you were lying to Judge Kamp up in Cape Girardeau County, when you swore to tell the truth, and told him that you, indeed, did the crime that you were charged with; is that not correct?"

After some additional questions, defendant's trial attorney objected telling the trial court, "The other charges, he's using it improperly; that he's just beating him to death." The trial court acknowledged defendant's objection stating, "All right. We've pretty well got this wore [sic] out." The line of inquiry then terminated.

Although defendant states in his claim of error that the trial court erred in overruling his objection to the prosecutor's questions, the record does not reflect that the objection was overruled. Somewhat similar to what occurred in *State v. McIlvoy*, 629 S.W.2d 333, 340 (Mo. banc 1982), and in *State v. Pagano*, 882 S.W.2d 326, 334 (Mo.App.1994), the result defendant sought occurred, the line of inquiry ceased. Having not requested further relief at trial, defendant's allegation of error in Point III is a request for plain error review. *State v. White*, 782 S.W.2d 461, 465 (Mo.App.1990).

This court does not find that the events about which defendant complains in Point III had a decisive effect on the jury. Plain error relief is not warranted. *McIlvoy, supra*.

---

3. "Matters dehors the record are not considered in the course of appellate review." *Brawley &*

*Flowers, Inc. v. Gunter*, 934 S.W.2d 557, 561 (Mo.App.1996).

Point III is denied. The judgment is affirmed.

MONTGOMERY, C.J., and SHRUM, J., concur.