STATE of Missouri, Plaintiff–Respondent,

v.

Antonio A. BRYANT, Defendant–Appellant.

No. SD 30797.

Missouri Court of Appeals, Southern District, District One.

March 23, 2012.

Margaret M. Johnston, Columbia, for Appellant.

Chris Koster, Atty. Gen., Shaun J. Mackelprang, Jefferson City, for Respondent.

NANCY STEFFEN RAHMEYER, Judge.

Antonio A. Bryant ("Appellant") brings an appeal from his conviction for the distribution of a controlled substance in violation of section 195.211.[1] Appellant claims (1) the trial court abused its discretion in overruling his objection to the State's closing argument regarding his failure to call certain witnesses and (2) the trial court plainly erred in overruling his objection to testimony of uncharged crimes and bad acts. We find no error and affirm.

We review the facts in the light most favorable to the verdict. *State v. Basile,* 942 S.W.2d 342, 347 (Mo. banc 1997). As such:

On the afternoon of June 10, 2008, Detective Casey Wilkerson of the Springfield Police Department, while working undercover, met with Appellant to purchase crack cocaine in the parking lot of a local gas station. The purchase was arranged by a confidential informant. The same confidential informant had arranged for Detective Wilkerson and Appellant to be introduced within the thirty days leading up to the purchase. During the prior meeting, Detective Wilkerson, the confidential informant, and Appellant spent approximately fifteen to twenty minutes together during the daytime in a parking lot

---

1. All references to statutes are to RSMo Cum. Supp.2003, and all rule references are to Missouri Court Rules (2011), unless otherwise specified.

where they first parked next to each other and then exited their vehicles and stood about four to five feet apart while speaking. The confidential informant referred to Appellant by the nickname of "Fried" and also as "Antonio."

On the day of the drug transaction, Detective Wilkerson drove to the gas station and met Appellant; the confidential informant rode in the front passenger seat of Detective Wilkerson's vehicle. Appellant, who was already on scene in his Cadillac, informed the two that his supplier had not yet arrived. Appellant got out of his vehicle and stood at the passenger side of Detective Wilkerson's vehicle for approximately two or three minutes. When the supplier arrived, Detective Wilkerson exited his vehicle and shook hands with Appellant. Appellant and Detective Wilkerson then traveled around the southern side of the building and walked up to the window of the supplier's vehicle. Detective Wilkerson immediately recognized the supplier as Elizabeth Pike because he had previously purchased crack cocaine from her and her husband. She recognized Detective Wilkerson as a former customer and he quickly explained that he was using Appellant because he had lost her phone number. She found the explanation acceptable and removed a package of crack cocaine from her bra and exchanged it with Detective Wilkerson for $100.

After the exchange, Detective Wilkerson returned to his office in order to do field testing, packaging, and paperwork. He weighed and photographed the crack cocaine for court purposes, packaged it according to standard operating procedure, put evidence tape on it, did a field test on it, and marked it as sealed, all before submitting it to the Missouri State Highway Patrol Crime Lab Division with a request that it be tested to determine if it was a controlled substance. After the crack cocaine was weighed, it was clear that Pike had mistakenly given Detective Wilkerson the wrong bag as it contained quite a bit more than he had purchased. Pike also discovered the mistake and called Detective Wilkerson to try and get the drugs back, to no avail. The Missouri State Highway Patrol Crime Lab Division analyzed the substance and determined that it contained cocaine base and, therefore, was a controlled substance. It weighed 1.95 grams.

Detective Wilkerson cross-referenced the license plate of the Cadillac that Appellant was in with the Department of Revenue ("DOR") records and found that it was registered to Appellant. Detective Wilkerson also checked Appellant's driver's license record and pulled up Appellant's picture through the DOR records. The picture matched the individual he met with on both the date of the earlier introduction and the date of the purchase of the crack cocaine. Appellant was subsequently arrested and charged with the class B felony of distribution of a controlled substance.

While in jail, Appellant used the jail telephone to make several phone calls to his girlfriend and the mother of his two children, Evelyn Flemons, which were recorded on a hard drive at the jail. The prosecutor requested that the recorded calls to a specific number be pulled by an employee of the jail and, at trial, two of the recorded calls were offered by the State as Exhibits 9 and 10, which were admitted and played for the jury.[2]

---

**2.** One of the recorded calls was a three-way call. In closing argument, the State claimed the three-way call was between Appellant, Ms. Flemons, and Appellant's mother. According to the State's brief on appeal, during the call, Appellant asked Ms. Flemons to call his mother and Appellant's mother did join the call. As Appellant failed to include the recordings

At trial, Ms. Flemons testified that, while eight months pregnant with twins, she drove up from Conway, Arkansas, on June 8, 2008, to visit Appellant the same week the alleged drug purchase occurred. She stated that during the week-long visit she and Appellant spent time together, ate at different restaurants, went shopping, and visited family members, including his grandmother's, cousin's and aunt's homes. She further testified they were at his Aunt Brenda's home at the time Detective Wilkerson claims to have purchased drugs from Appellant. Ms. Flemons testified that Appellant did not leave her side that week because she "had put [her] pregnant belly in a car with his son and driven four hours to see him. If he had tried to go anywhere without [her, she] would have got [sic] in the car and come home." She testified that she had never known Appellant to go by the nickname "Fried," and that they had argued in June about his loaning the car she had purchased for him to his friends.

On cross-examination, Ms. Flemons reiterated that she was certain that she had spent June 10th with Appellant at his Aunt Brenda's house; they played dominoes, ate, barbecued, and visited with family. She testified that she and Appellant took naps together and that Appellant did not leave the house the entire day. Ms. Flemons admitted that she and Appellant talked on the jailhouse phone about his case and discussed obtaining his attendance records from Vatterott College on the day in question, placing a tape recorder in his mother's purse at trial so that Ms. Flemons could testify consistently with other witnesses, using the loss of one of her twins in utero as the time frame for her visit, and being his alibi witness. Ms. Flemons further testified that she obtained the school records the day before trial and they showed that Appellant was not in school on June 10th.

Appellant claimed an alibi defense and on the Notice of Alibi he listed Ms. Flemons [3] and Maybelle Bryant, Appellant's mother, as witnesses. During the State's closing rebuttal argument, the State was allowed to argue, over Appellant's objection, that Appellant's mother, grandmother, and aunt did not testify and that "[t]he only reason they're not here is because his family won't lie for him." The jury found Appellant guilty of distribution of a controlled substance, in violation of section 195.211, and Appellant was sentenced to ten years in the Missouri Department of Corrections. This appeal followed.

In Appellant's first point he contends the trial court erred in overruling his objection to the State's closing argument concerning the absence of testimony from his mother, grandmother, and aunt because it was an improper, adverse inference argument. The State contends that the closing argument remark was based on evidence that had been presented at trial, specifically Exhibits 9 and 10, which were the phone conversations from the jail that were played for the jury. The State contends that the jury could infer from the telephone conversations that Ms. Flemons' testimony was coached by Appellant and that his mother had already talked to defense counsel indicating that she could only generalize that she had visited with Appellant all the time during June, with no specific dates. The State further argues that the taped telephone conversations indicated that Appellant's attorney wanted "Granny" to testify but Appellant did not

in the legal file on appeal, we do not have the benefit of listening to the evidence and confirming such information.

3. The notice incorrectly listed Ms. Flemons surname as Flemings.

know whether she would be willing to do so. The inference concerning "Granny," from the taped conversations, was that "Granny" was not going to answer the telephone so that she would not have to testify. Further, apparently there was no mention in the phone conversations of Appellant's aunt being an alibi witness.

■ Again, the recorded telephone conversations between Appellant and Ms. Flemons, which were played for the jury, were omitted from the legal file and exhibits and are not before us in the record on appeal. Therefore, we have no way of independently determining what conversations were played for the jury and the content of those conversations. Rule 30.04(a) requires that the record on appeal contain "all of the record, proceedings and evidence necessary to the determination of all questions to be presented, by either appellant or respondent, to the appellate court for decision." Further, it was Appellant's duty to prepare the legal file. Rule 30.04(c). Since the exhibits were not filed with this Court, we will infer that they would be favorable to the trial court's ruling and unfavorable to Appellant's argument. *State v. Brumm*, 163 S.W.3d 51, 56 (Mo.App. S.D.2010). As such, the State's comment concerning the witnesses not supporting Appellant's alibi was merely a comment on the evidence produced at trial. Point I is denied.

■ In his second point, Appellant contends that the trial court plainly erred in admitting evidence that Appellant was abusive toward his former girlfriend. Appellant's claim was not preserved for review. To preserve a claim for appellate review, an appellant is required to make an objection at the trial and raise the same objection in his motion for new trial. *State*

*v. Chambers*, 234 S.W.3d 501, 512 (Mo. App. E.D.2007). Here, Appellant failed to include his claim in his motion for a new trial and, thus, our only review would be for plain error under Rule 30.20. Rule 30.20 provides, in part, "[P]lain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." If this Court decides to review for plain error, Appellant must show that the trial court made an evident, obvious, and clear error, which so substantially violated his rights that manifest injustice or a miscarriage of justice would result if left uncorrected. *State v. Taylor*, 166 S.W.3d 599, 604 (Mo.App. S.D.2005). A claim of plain error places a much greater burden on an appellant than an assertion of prejudicial error. *Id.* at 603.

Appellant called Maribelle Bailey, the mother of his former girlfriend, Marlina Tabor, as a witness. Appellant's counsel attempted to elicit testimony from Ms. Bailey that she did not see Appellant the second week of June.[4] The witness did not cooperate in this regard and merely testified that her daughter and Appellant had "frequent breakups" of "[u]sually no more than a week." When pressed by Appellant's counsel, Ms. Bailey again stated that "[t]here was [sic] several periods where they were broke up and [she] did not see [Appellant] with [her daughter,]" but she could not be "100 percent sure it was the second week of June."

At the end of direct examination, Appellant's counsel asked:

[Appellant's counsel]: Marlina and [Appellant] are no longer together, correct?

[Ms. Bailey]: Not since he's been incarcerated.

___

4. Apparently, the tenuous inference for the jury was that if Appellant was not with Ms. Tabor he necessarily would have been with Ms. Flemons.

[Appellant's counsel]: And you do not like him, correct?

[Ms. Bailey]: I don't have very positive feelings for him, no.

During the State's cross-examination, the prosecutor stopped and asked to approach the bench for a sidebar. The prosecutor noted that one of the last questions Appellant's counsel asked Ms. Bailey concerned her dislike of Appellant. The prosecutor stated:

At this point I believe the State is entitled to ask why, to explore any sort of motive, bias, or prejudice.... Her answer will be: He tried to get my daughter to use drugs, and he was abusive to her. But I do believe because she asked the questions, you don't like him, do you, it would be proper for us to ask why. It is their witness. They're the ones who are bringing out a motive or bias, and I think we're entitled to explore it.

Appellant's counsel argued that Ms. Bailey's response would be highly prejudicial and would amount to testimony regarding prior bad acts and uncharged crimes. The trial court, however, noted that Appellant's counsel had opened the door and agreed that the State had a right to cross-examine as to the reasons Ms. Bailey did not like Appellant. The proceedings then returned to open court and the following exchange occurred over Appellant's objection:

[Prosecutor]: Ms. Bailey, I have just a few more questions for you. [Appellant's counsel] asked you whether or not you liked [Appellant], and you indicated that you didn't have very positive feelings for him. So I'm going to ask you why.

. . . .

[Ms. Bailey]: There was [sic] several instances where he was very abusive to my daughter, not only physically but mentally.

In a criminal case, great latitude is allowed on cross-examination and the trial court has discretion when determining the extent of cross-examination. *State v. Lue*, 598 S.W.2d 133, 138 (Mo. banc 1980). When a defendant injects an issue into the case, the State may be allowed to admit otherwise inadmissible evidence to explain or counteract a negative inference raised by the issue injected. *State v. Hamilton*, 892 S.W.2d 371, 379 (Mo.App. E.D.1995). "Rebuttal evidence may directly or indirectly explain, counteract, repel, or disprove a defendant's evidence either directly or by implication." *Id.*

Appellant called the witness in his case expecting favorable testimony. When the witness testified in a manner that appeared to be counter to the expected testimony, Appellant attempted to impeach the witness with evidence of bias. Appellant opened the door by introducing the issue of the witness's bias and, as stated in *Hamilton*, the State was allowed to explain or counteract the issue. Further, the State only sought testimony directly related to the question asked of the witness on direct examination. The State confined the exploration of the witness's bias to a question on cross-examination which was within the scope of the direct examination. The State did not attempt to introduce photographs or other exhibits depicting an assault, did not mention the abuse in closing argument, and did not otherwise offer proof of uncharged crimes or bad acts. Given the wide latitude afforded on cross-examination, Appellant failed to show that the trial court made an evident, obvious, and clear error, which so substantially violated his rights that manifest injustice or a miscarriage of justice would result if left uncorrected. Point II is denied.

The judgment is affirmed.

BURRELL, P.J., LYNCH, J., concur.