

# Missouri Court of Appeals

## Southern District

### Division One

STATE OF MISSOURI, )
                       )
        Plaintiff-Respondent, )
                       )
v. )    No. SD32610
                       )    Filed: 9-25-15
RYAN N. EVANS, )
                       )
        Defendant-Appellant. )

### APPEAL FROM THE CIRCUIT COURT OF PHELPS COUNTY

Honorable Mary W. Sheffield, Circuit Judge

### AFFIRMED

Ryan Evans (Defendant) was convicted of murder in the second degree and abuse of a child. *See* §§ 565.021, 568.060.[1] He was sentenced to concurrent terms of life imprisonment for abuse of a child and thirty years for murder in the second degree. On appeal, Defendant presents ten points of error. Finding no merit in any of his points, we affirm.

Defendant contests the sufficiency of the evidence to support his convictions. "We consider the facts and all reasonable inferences derived therefrom in a light most

---

[1] All statutory references are to RSMo (2000). All rule references are to Missouri Court Rules (2014).

favorable to the verdict, and we reject all contrary evidence and inferences." ***State v. Campbell***, 122 S.W.3d 736, 737 (Mo. App. 2004). Viewed from that perspective, the following facts were adduced at trial.

Victim was born in Indiana on March 31, 2005. His parents separated when he was three months old, at which time he moved with his mother (Mother) to Missouri. Victim's biological father (Father) had visitation every other weekend and brought Victim back to Indiana, where Father lived with his parents on their farm. Father and his parents, as well as Mother and her parents, testified that they never saw any indications that Victim was prone to abnormal bruising or bleeding. In August 2006, Mother and Victim began living with Defendant in Waynesville, Missouri.

In early October 2006, Mother's parents traveled to Waynesville and spent four days at the townhouse that Mother and Victim shared with Defendant. During that period, they noticed that Victim had a black eye, a bruise on the left side of his head, scabs on his ear, and what appeared to be a bruise inside his ear. According to Defendant, Victim's black eye resulted from a fall in his toy box, and the other bruises resulted from a fall off of a porch. Defendant made Victim wear sunglasses when they went out in public. On one occasion, Defendant and Mother were outside smoking when Victim walked up to the windows and pulled the blinds apart. What then transpired, according to Mother's stepfather, was that Defendant "busted in the door" and said, "boy, you'd better run if you know what's good for you." Victim then proceeded to run away and, according to Mother's stepfather, appeared scared. Following this incident, Mother's parents considered taking Victim back with them to Indiana.

On October 22, 2006, Mother took Victim to the emergency room at General Leonard Wood Army Community Hospital, where he was seen by Dr. Arturo

2

Montellano.  Mother told Dr. Montellano that Victim had not had a bowel movement for three or four days and also had vomited during that period.  The doctor noticed a small bruise on Victim's left cheek during his examination.  Victim had a normal temperature, was breathing normally, had clear lungs and chest, and did not appear to be in any acute distress.  Dr. Montellano ordered a glycerine suppository that caused Victim to have a bowel movement.  Victim was sent home with instructions that he be given Pedialyte to calm his stomach.

The following day, Mother went to work about 4:30 p.m., leaving Victim in Defendant's care.  Shortly before 8:00 p.m., the Waynesville Rural Fire Protection District was dispatched to a call for a breathing difficulty.  The first responders were en route to the address when Defendant, holding Victim, flagged them down at a nearby intersection. The first responders observed that Victim was limp and that his eyes had rolled back in his head.  He was not breathing and had no pulse.  He had turned blue around the lips and nose, and mucus was present around the mouth and nose.  One of the first responders performed CPR on Victim.  Eventually, an ambulance arrived, and Victim was taken to General Leonard Wood Army Community Hospital.

While en route to the hospital, paramedics observed that Victim had bruises on his forehead and the left side of his face.  At the hospital, a child-abuse instructor, who had been asked to help investigate, noticed similar bruising.  Dr. Montellano, the emergency room doctor who treated Victim the previous day, noted that Victim was unresponsive upon arrival.  Efforts to resuscitate Victim, including the administration of epinephrine and fluids, resulted in a restored heartbeat.

Thereafter, Victim was airlifted to Cardinal Glennon Children's Hospital in St. Louis.  Upon arrival, Victim did not display any cranial nerve reflexes.  He was placed on

3

a ventilator and began to experience cardiac difficulties. Scans revealed no blood flow to Victim's brain. Victim was eventually declared brain dead, and his respirator was removed.

Father and his parents traveled to St. Louis after being notified that Victim had been taken to the hospital. When Father saw Victim, he noticed that bruises were developing on the left side of Victim's face. Father held his hand up to the bruising and observed that the pattern matched that of an open hand. Both Father's and Mother's parents also observed the bruises. Mother's stepfather testified that four bruises on Victim's face appeared to be knuckle marks. When Father's parents encountered Defendant at the hospital, they asked what had happened to Victim. Defendant refused to look at them and walked away. Father's parents followed Defendant outside the hospital and continued to ask him what had happened, but Defendant did not respond and continued to walk away. Defendant also reacted angrily and denied doing anything to Victim when a statement was made that Victim's injuries were the result of abuse, even though no accusation had been directed against Defendant at that point.

A police officer who interviewed Defendant and Mother testified that he was told that Defendant was Victim's primary caregiver and that he was alone with Victim between the time that Mother went to work and the time that Defendant sought medical attention for Victim. The officer also testified that neither Defendant nor Mother reported that Victim was having any problems prior to when Mother left for work.

An autopsy showed that Victim suffered five bruises near the left temple and three more on the left cheek, extending from the eye to the jaw. Victim also had a bruise on the left side of the forehead and the left side of the neck, a scratch on the nose, a bruise to the left eye, bruises on the back of his head, bruises to both ears, and a bruise to the

4

inside of the lower lip. Victim's frenulum, which attaches the upper lip to the gum, was torn. Another five bruises were found underneath the scalp on the middle to left side of Victim's head. The autopsy also disclosed a subdural hematoma. The doctor who performed the autopsy testified that he did not see any injuries or bruising that would have been caused by resuscitation efforts. He determined to a reasonable degree of medical certainty that the cause of Victim's death was a closed head injury inflicted by blunt trauma and that the manner of death was homicide. This opinion was confirmed by the doctor's supervisor, who observed the autopsy and independently reviewed microscopic slides prepared during the autopsy. The supervisor testified that he saw no evidence in the slides that Victim had pneumonia.

Dr. Ann Dimaio, the emergency room doctor at Cardinal Glennon, testified that the concentration of bruising on Victim's face, neck and head, combined with the massive head injury he suffered, led to concerns that child abuse was involved. She testified that Victim had retinal hemorrhages consistent with an abusive head injury. Dr. Dimaio said that she had never seen a similar pattern of bruising and head injury caused by resuscitation. She also testified that the pattern of bruising and the retinal hemorrhaging were not consistent with vomiting. The pattern of bruising also was not consistent with a vitamin K deficiency. Dr. Dimaio opined that Victim's medical history and the autopsy results showed he did not have a vitamin K deficiency. Victim also did not display any signs of pneumonia. Dr. Dimaio testified that, to a reasonable degree of medical certainty, it appeared that someone had abused Victim and caused him to suffer a head injury. She testified that the head injury did not look like an accidental head injury.

Dr. Robert Lynch, who also treated Victim at Cardinal Glennon, testified that Victim's history, physical examination, and the dramatic change in his neurological

5

status suggested that he had suffered a sudden traumatic injury to the brain. Dr. Lynch testified that he did not find anything to suggest that the change in Victim's neurological status was the result of having pneumonia or was caused by a vitamin K deficiency.

Dr. Jeremy Garrett, a specialist in pediatric critical care medicine, also participated in Victim's care. He testified that Victim suffered traumatic injuries that caused his brain to swell and his breathing to cease. Dr. Garrett testified that the bruising on Victim's face was not the type that would be caused from running into a table or falling down, but was instead consistent with inflicted injuries. Dr. Garrett testified that Victim's retinal hemorrhages would rarely be caused by an accident. Dr. Garrett did not believe that Victim had a vitamin K deficiency and did not see any evidence that he was suffering from pneumonia. Dr. Garrett testified that, in more than twenty years as a physician, he had never seen resuscitation efforts cause the pattern of bruising that Victim displayed.

Forensic pathologist and neuropathologist Dr. Mary Case examined Victim's brain and eyes. She found evidence of fresh blood on the outer surface of the brain. Dr. Case testified that the location of the blood indicated that the brain and the skull had moved in different directions and that it would take a large amount of force to create such movement. Dr. Case said that type of movement would usually require an impact to the head. Dr. Case also examined the axons, which are connections between nerve cells, and determined that they showed signs of a traumatic injury. Dr. Case's examinations of Victim's eyes disclosed bleeding in the optic nerve sheath, which she testified was often associated with certain types of inflicted trauma to the heads of young children. She also observed retinal hemorrhages that she testified were frequently associated with inertial brain injury and related to the actual movement of the eye. Dr. Case testified that the

6

injuries to Victim's brain were highly indicative of a traumatic brain injury inflicted by another person, and that the injuries were consistent with an impact, such as being hit with a fist. She also testified that the injuries Victim suffered, including his external bruising, were not caused by the efforts to resuscitate him.

The defense called several witnesses, including medical experts who testified, *inter alia*, that Victim did not have a brain injury caused by trauma.[2] Defendant also testified on his own behalf. Thereafter, the jury found him guilty of murder in the second degree and abuse of a child. This appeal followed. Additional facts necessary to the disposition of his appeal are included below as we address Defendant's ten points of error. For ease of analysis, we will review Defendant's points out of order.

*Point V – Sufficiency of the Evidence*

In Point V, Defendant contends the evidence was insufficient to support his convictions. **State v. Nash**, 339 S.W.3d 500 (Mo. banc 2011), summarized the principles that govern an appellate court's role in deciding that issue:

> Generally, this Court's review of the sufficiency of the evidence is limited to whether the State has introduced sufficient evidence for any reasonable juror to have been convinced of the defendant's guilt beyond a reasonable doubt. *State v. Bateman,* 318 S.W.3d 681, 686-87 (Mo. banc 2010). This is not an assessment of whether the Court believes that the evidence at trial established guilt beyond a reasonable doubt but rather a question of whether, in light of the evidence most favorable to the State, any rational fact-finder "could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 687 (internal quotations omitted). In reviewing the sufficiency of the evidence, all evidence favorable to the State is

---

[2] Pathology consultant Dr. Peter Stephens testified that Victim died from aspirational pneumonia. Forensic pathologist Dr. John Plunkett testified that Victim died from necrotizing pneumonia and that he did not see any evidence that Victim's bruising was caused by anything other than the medical care provided to him. Consulting forensic pathologist Dr. George Nichols testified that Victim died from hypoxic ischemic encephalopathy and that he did not have a brain injury caused by trauma. Neuropathologist Dr. Jan Leestma testified that Victim died from swelling of the brain that caused too much pressure inside the head, and that Victim's bruising was not associated with his death but was probably caused by medical treatment.

accepted as true, including all favorable inferences drawn from the evidence. *Id.* All evidence and inferences to the contrary are disregarded. *Id.* "When reviewing the sufficiency of evidence supporting a criminal conviction, the Court does not act as a 'super juror' with veto powers, but gives great deference to the trier of fact." *State v. Chaney,* 967 S.W.2d 47, 52 (Mo. banc 1998) (internal quotations omitted). "[T]his Court will not weigh the evidence anew since the fact-finder may believe all, some, or none of the testimony of a witness when considered with the facts, circumstances and other testimony in the case." *State v. Freeman,* 269 S.W.3d 422, 425 (Mo. banc 2008) (internal quotations omitted).

*Id*. at 508-09. In addition, "[t]he State may rely upon direct and circumstantial evidence to meet its burden of proof." **State v. Burks**, 373 S.W.3d 1, 3 (Mo. App. 2012). In our review, "circumstantial evidence is afforded the same weight as direct evidence." **State v. Stewart**, 265 S.W.3d 309, 314 (Mo. App. 2008).

Defendant was convicted of second-degree felony murder on the basis that he committed the class A felony of abuse of a child resulting in death. *See* §§ 565.021.1(2), 568.060.3(2).[3] Thus, to sustain Defendant's convictions for murder in the second degree and abuse of a child, the State had to prove that Defendant's conduct caused Victim's death. *See* **State v. Hopper**, 326 S.W.3d 143, 149 (Mo. App. 2010). Defendant contends the evidence was insufficient to prove that he caused Victim's death. We disagree. Viewed in the light most favorable to the verdict, the State presented sufficient evidence from which a reasonable juror could find Defendant guilty of abuse of a child and second-degree murder.

_____

[3] Section 565.021.1(2) provides that a person commits second-degree murder when he "[c]ommits or attempts to commit any felony, and, in the perpetration or the attempted perpetration of such felony ... another person is killed as a result of the perpetration or attempted perpetration of such felony[.]" *Id*. Section 568.060.1(1) provides that "[a] person commits the crime of abuse of a child if such person ... [k]nowingly inflicts cruel and inhuman punishment upon a child less than seventeen years old." *Id*. Pursuant to § 568.060.3(2), when "[a] child dies as a result of injuries sustained from conduct chargeable pursuant to the provisions of this section ... the crime is a class A felony." *Id*.

A few weeks before Victim's death, his grandparents noticed that Victim had a black eye, scabs on his ear, a bruise on the left side of his head and a bruise inside his ear. Defendant behaved so aggressively toward Victim that the grandparents considered taking the child back to Indiana. The day before Victim's death, he was taken to the emergency room for treatment of constipation and vomiting. At that time, he only had a small bruise on his left cheek. He otherwise was breathing normally, his chest and lungs were clear, and he did not appear to be in acute distress.

The next day, Defendant was alone with Victim when he sustained his fatal injuries. Mother left for work more than three hours before 911 was called, leaving Victim in Defendant's care. A police officer who interviewed Defendant and Mother testified that he was told that Defendant was Victim's primary caregiver and that he was alone with Victim between the time that Mother went to work and the time that he sought medical attention for Victim. The officer also testified that neither Defendant nor Mother indicated that Victim was having any problems prior to when Mother went to work. The evidence that Victim was injury-free before being left in Defendant's care supports a reasonable inference that Defendant inflicted Victim's injuries. *See* ***State v. Barker***, 410 S.W.3d 225, 237-38 (Mo. App. 2013); ***Hopper***, 326 S.W.3d at 150; ***State v. Yeager***, 63 S.W.3d 307, 312 (Mo. App. 2001).

When Victim was taken to the nearby Army hospital, the ambulance paramedics noticed bruising on his forehead and left side of his face. En route to St. Louis, the flight paramedics also saw bruising on the left side of Victim's face and ear that progressed during the flight. At the hospital in St. Louis, doctors and family members noted extensive bruising, with the facial bruises appearing to have been made by an open hand and by knuckles. Defendant's behavior at the hospital supported the reasonable inference

9

that he was exhibiting consciousness of guilt. He refused to talk to Victim's paternal grandparents when they asked him what had happened and instead walked away from them. Defendant also reacted angrily and denied doing anything when a statement was made that Victim's injuries were the result of abuse, even though no accusation had been directed against Defendant at that point. *Cf.* ***State v. Jones***, 427 S.W.3d 191, 198 (Mo. banc 2014) (defendant was not acting like a parent who just lost a child but one who knowingly caused child's death, demonstrating a consciousness of guilt).

The autopsy report showed: (1) five bruises near the left temple; (2) three bruises on the left cheek that extended from the eye to the jaw; (3) bruises on the left side of the forehead; (4) bruises on the left side of the neck; (5) bruises on the left eye; (6) bruises on the back of the head; (7) bruises on both ears; (8) bruises on the inside of the lower lip; (9) five bruises underneath the scalp; and (10) a torn frenulum. A CT scan showed a swollen brain with bleeding on top of the brain, and the autopsy disclosed blood on top of the left side of the brain. Victim also had retinal hemmorhages that were consistent with an abusive head injury. Drs. Dimaio, Lynch, Garrett and Case, who either treated Victim or reviewed his injuries, testified that he died from a traumatic head injury and that the injuries were not consistent with being inflicted accidentally or by resuscitation efforts. The doctors testified that Victim's injuries were not consistent with other medical conditions, such as pneumonia or a vitamin K deficiency. The medical testimony that Victim's injuries were consistent with abuse and not caused by accident or medical treatment supports a reasonable inference that Defendant committed the crimes of child abuse and second-degree murder. *See* ***State v. Snow***, 437 S.W.3d 396, 399 (Mo. App. 2014); ***Barker***, 410 S.W.3d at 238; ***Hopper***, 326 S.W.3d at 150; ***Yeager***, 63 S.W.3d at 312.

In sum, the evidence was sufficient for a reasonable juror to find that Defendant inflicted Victim's injuries that resulted in Victim's death. *See Barker*, 410 S.W.3d at 238. Accordingly, the evidence was sufficient to support Defendant's convictions.[4] Point V is denied.

*Point I*

In Point I, Defendant contends the trial court erred by allowing Dr. Case to testify about her ability to distinguish between brain injuries caused traumatically and non-traumatically. The trial court decided that Dr. Case's testimony was admissible after conducting a *Frye* hearing. *See Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). "For criminal cases, Missouri follows the standard for admissibility of results of scientific procedures enunciated in *Frye.*" *Dorsey v. State*, 448 S.W.3d 276, 297 (Mo. banc 2014). Accordingly, the results of scientific procedures "may be admitted only if the procedure is 'sufficiently established to have gained general acceptance in the particular field in which it belongs.'" *State v. Davis*, 814 S.W.2d 593, 600 (Mo. banc 1991) (quoting *Frye*, 293 F. at 1014). The following facts are relevant to this point.

Defense counsel filed a pretrial motion alleging that Dr. Case's methodology was not generally accepted in the relevant scientific community and requesting a *Frye* hearing on that issue. Dr. Case, a forensic pathologist and neuropathologist, provided extensive

---

[4] Defendant argues that the evidence was insufficient because "the State opted to use false scientific testimony." Aside from Defendant's failure to convince us that anyone testified falsely, his argument is misdirected because the foundation for scientific testimony goes to its admissibility, not its sufficiency. *See Bradshaw v. State*, 375 S.W.3d 237, 243 (Mo. App. 2012); *In re Muston*, 350 S.W.3d 493, 497-98 (Mo. App. 2011). We also reject Defendant's argument that there was no evidence connecting Defendant to Victim's death. Acceptance of that argument would require us to disregard our standard of review by ignoring the jury's ability to draw reasonable inferences from the evidence. *See State v. Wolfe*, 344 S.W.3d 822, 834 (Mo. App. 2011).

testimony during that hearing.[5] Dr. Case testified, *inter alia*, that in examining Victim's brain, she used a "beta-amyloid precursor protein" (BAPP) stain to identify damage to the axons, which are the processes that run between nerve cells. The doctor explained that it is difficult to see axon damage in young children and that BAPP staining had been used for the past fifteen years to make that determination. She identified six articles that were admitted into evidence, each dealing with the use of BAPP staining to identify traumatic brain injury in children. Dr. Case testified that the theory and techniques that she employed in Defendant's case were generally accepted and relied upon in the forensic pathology and neuropathology communities.

Defendant countered with testimony from Dr. John Plunkett, a consulting forensic pathologist. Dr. Plunkett acknowledged that the use of BAPP staining to show damage to nerve fibers was a valid technique. He opined, however, that there was no scientific evidence to support the conclusion that one could reliably differentiate traumatic from non-traumatic or "hypoxic-ischemic" damage in a background of hypoxic-ischemic damage. Dr. Plunkett's written opinion and several other articles also were admitted into evidence.

Thereafter, the court issued a written order finding that Dr. Case's testimony was admissible for the following reasons:

> The Court having heard the evidence, makes a finding that BAPP testing is generally accepted in the scientific community, that Dr. Mary Case['s] protocol/methodology was called into question as to her results on traumatic axonal injuries as compared to HIE [hypoxic-ischemic events]; the court finds that the dispute did not prevent the admissibility of the test,

---

[5] Dr. Case served as the chief medical examiner for St. Louis, St. Charles, Jefferson and Franklin Counties, and was also a professor of pathology at St. Louis University. Dr. Case was board certified in anatomical pathology, neuropathology and forensic pathology. She developed an interest in studying the brains of deceased children and had received brains for study from pathologists across the country since 1975.

but goes to the weight of the witness and the test which can be presented to the jury. The procedure has been sufficiently established to have gained general acceptance in the field of neuropathology or biomechanical engineers.

At trial, when Dr. Case was testifying as to her findings with respect to BAPP staining, defense counsel objected that her testimony was "without foundation" and "hearsay." Those objections were overruled.

Defendant's first point contends the trial court erred in allowing Dr. Case to testify about her ability to distinguish brain injuries caused traumatically from those caused non-traumatically because her "methodology lacked general acceptance in the relevant scientific community[.]" The State argues that this point is not preserved because that objection was not made when Dr. Case testified at trial. We agree.

The ruling made by the trial court after conducting the *Frye* hearing was interlocutory and subject to change during trial. Therefore, a timely and specific objection to Dr. Case's testimony at trial was necessary to preserve the issue for appellate review. *See Elliott v. State*, 215 S.W.3d 88, 92 (Mo. banc 2007); *State v. Patton*, 419 S.W.3d 125, 129 (Mo. App. 2013); *State v. Boydston*, 198 S.W.3d 671, 674 (Mo. App. 2006). The point on appeal must be based upon the same objection made at trial. *Boydston*, 198 S.W.3d at 674.

At trial, defense counsel did not make a specific objection that Dr. Case's testimony failed to satisfy the *Frye* test. Instead, the only objections were based upon hearsay and lack of foundation. On appeal, the hearsay objection has been abandoned. Defendant's objection that Dr. Case's testimony was "without foundation" constituted a general objection because it did not specify what foundational element was lacking. Therefore, it was inadequate to preserve the matter for appellate review. *See State v.*

13

*McFadden*, 369 S.W.3d 727, 753 (Mo. banc 2012); *State v. Irby*, 254 S.W.3d 181, 192 (Mo. App. 2008); *Boydston*, 198 S.W.3d at 674.

In our discretion, we may review for plain error. *See* Rule 30.20; *State v. Edberg*, 185 S.W.3d 290, 293 (Mo. App. 2006). A defendant is not entitled to relief pursuant to the plain error rule unless he demonstrates an error so substantially affecting the defendant's rights that a manifest injustice or a miscarriage of justice would inexorably result absent a correction of the error. *State v. Oplinger*, 193 S.W.3d 766, 770 (Mo. App. 2006). The first step in that process is to determine whether the trial court committed evident, obvious and clear error affecting the defendant's substantial rights. *State v. Mack*, 301 S.W.3d 90, 95 (Mo. App. 2010). Based upon our review of the record, the trial court did not commit any error, plain or otherwise, in admitting Dr. Case's testimony.

A trial court has broad discretion to admit or exclude evidence at trial, and the trial court's ruling will be reversed only if the court clearly abused its discretion. *State v. Forrest*, 183 S.W.3d 218, 223 (Mo. banc 2006). Defendant's own expert, Dr. Plunkett, conceded at the *Frye* hearing that BAPP staining is a legitimate scientific technique for identifying damaged axons. *See, e.g.*, *State v. Johnson*, 402 S.W.3d 182, 187 (Mo. App. 2013) (upholding admission, without a *Frye* hearing, of Dr. Case's testimony using BAPP staining as a generally accepted procedure in the scientific community to diagnose traumatic axonal injury). Defendant's criticism is instead directed at the manner in which Dr. Case interpreted the BAPP staining results. Generally, the manner in which tests are conducted goes to the credibility of the witness and the weight of the evidence – questions ultimately for the jury to decide. *See Davis*, 814 S.W.2d at 603; *State v. Keightley*, 147 S.W.3d 179, 189 (Mo. App. 2004). Here, Defendant had ample

14

opportunity during cross-examination to discredit the manner in which Dr. Case interpreted the results of the BAPP procedure and present his own experts who disagreed with Dr. Case's conclusions. *See* ***Keightley***, 147 S.W.3d at 189; ***State v. Huchting***, 927 S.W.2d 411, 418 (Mo. App. 1996). Therefore, the trial court's admission of Dr. Case's testimony was not an abuse of discretion, much less a plain error.

Moreover, the trial court's ruling did not prejudice Defendant because Dr. Case's testimony was cumulative of other medical testimony supporting the conclusion that Victim died from an inflicted trauma. It is well settled that, even if the admission of evidence was error, the ruling is not prejudicial when other properly admitted evidence establishes essentially the same facts. ***State v. Hadley***, 357 S.W.3d 267, 270 (Mo. App. 2012); *see also* ***State v. McLarty***, 327 S.W.3d 557, 565 (Mo. App. 2010) (erroneously admitted evidence is harmless error when cumulative of other evidence admitted for the same purpose). For all these reasons, Point I is denied.

*Points II-IV*

In Points II-IV, Defendant contends the trial court erred in allowing testimony from State experts "regarding so called 'Abusive Head Trauma or Injury[.]'" Defendant asserts error because: "all such testimony was false" (Point II); "there is new evidence showing that all such testimony was false testimony, in that all such testimony has since trial been determined false in the relevant scientific community" (Point III); and Defendant "is actually innocent, in that no reasonable juror would have voted to convict him absent the improper evidence" (Point IV). For reasons that follow, we find no merit in any of these points.

At the outset, we note that none of these three points are preserved for review because appropriate objections were not made at trial when the State's experts testified.

15

The materials forming the basis for Defendant's argument that the State presented "false evidence" were available at the time of Defendant's trial, but none of the information was presented to the jury. Instead, Defendant claimed for the first time in his motion for new trial that he was unjustly convicted because the trial court permitted the fraudulent use of scientific evidence. A claimed evidentiary issue not timely raised at trial is not preserved for appellate review. *State v. Green*, 307 S.W.3d 197, 200 (Mo. App. 2010); *see also State v. Shrout*, 419 S.W.3d 209, 215 (Mo. banc 2013).

Issues that were not preserved may be reviewed for plain error only, which requires the reviewing court to find that manifest injustice or a miscarriage of justice has resulted from the trial court error. *State v. Baumruk*, 280 S.W.3d 600, 607 (Mo. banc 2009); Rule 30.20. "A claim of plain error places a much greater burden on a defendant than an assertion of prejudicial error." *State v. Wright*, 216 S.W.3d 196, 199 (Mo. App. 2007). Plain error review involves a two-step analysis. *Mack*, 301 S.W.3d at 95. First, we determine whether the trial court committed evident, obvious and clear error affecting the defendant's substantial rights. *Id*. If we determine that a plain error occurred, however, we then must decide whether the error actually resulted in manifest injustice or a miscarriage of justice. *Id*.

Generally, a conviction resulting from the deliberate or conscious use by a prosecutor of perjured or false testimony violates due process and must be vacated. *State v. Cummings*, 400 S.W.3d 495, 504 (Mo. App. 2013). To succeed on the theory that the State knowingly used perjured testimony, Defendant had the burden to prove that: (1) the witness' testimony was false; (2) the State knew it was false; and (3) the conviction was obtained as a result of the perjured testimony. *Id*. Defendant has failed to make the required showing.

16

First and foremost, Defendant has not demonstrated that any of the State's testimony was false. In support of his argument, Defendant primarily relies on articles that raise criticisms of shaken baby syndrome. At most, those materials demonstrate the existence of a disagreement within the medical and scientific communities about the ability to distinguish traumatic from non-traumatic head injuries.[6] "To dispute [a doctor's] conclusion is not to prove that it is 'false.'" **Fuller v. Johnson**, 114 F.3d 491, 496 (5th Cir. 1997) (rejecting a similar claim of false testimony lodged against a coroner). The proper way to challenge an expert's method of reaching conclusions is through cross-examination. *Id.* at 496-97; *see* **Keightley**, 147 S.W.3d at 188; **Huchting**, 927 S.W.2d at 418. That is exactly what happened in this case. The real crux of Defendant's complaint under these points is that the jury chose to believe the State's evidence and disbelieve Defendant's evidence. Because Defendant has failed to show that the challenged testimony was false, he cannot demonstrate that the trial court committed any error in admitting the testimony, much less an "evident, obvious and clear error" affecting his substantial rights. **Mack**, 301 S.W.3d at 95. Our inquiry therefore ends. *Id*. Points II, III and IV are denied.[7]

---

[6] One of Defendant's expert witnesses, Dr. Leestma, acknowledged that differences of opinion exist within the medical community about the ability to determine the mechanism of a child's injury from the symptoms displayed by the child.

[7] With respect to Defendant's fourth point referencing "improper" evidence, our disposition of Points I and V, *supra*, demonstrate that the State's evidence was not only proper, but sufficient for a reasonable juror to find Defendant guilty of abuse of a child and second-degree murder.

*Point VII*

In Point VII, Defendant complains that the trial court erred in allowing the State to elicit from Defendant "improper character and prior bad acts testimony." The following facts are relevant to this point.

Prior to trial, defense counsel filed seven motions in limine – two of which specifically identified certain evidence alleged to be objectionable as improper character or prior bad acts evidence.[8] The trial court granted both of these motions and others, including a motion seeking to exclude Defendant's medical and mental health records.

At trial, Defendant elected to testify in his own defense. In pertinent part, Defendant testified briefly about his service in the military and that he was 60% disabled as a result of combat-related duties.

On cross-examination, the prosecutor inquired about the nature of Defendant's disability. Defendant testified that 50% was for post-traumatic stress syndrome, while the remaining 10% was for his left knee. The prosecutor then asked Defendant if he had been hospitalized for five days with a psychiatric condition shortly before Victim's death. When Defendant responded in the affirmative, the following exchange occurred:

[DEFENSE COUNSEL]: Objection, Your Honor. May I approach?

THE COURT: You may approach.

(COUNSEL APPROACHED THE BENCH AND THE FOLLOWING PROCEEDINGS WERE HELD.)

[DEFENSE COUNSEL]: Your Honor, this is impermissible cross-examination, and for the reasons stated in our motion in limine, we don't think this is proper testimony before the Court.

---

[8] In pertinent part, Defendant's motion in limine that sought to exclude prior bad acts evidence listed, in pertinent part: "(a) That the Defendant was discharged from the United States Army with a General Discharge under Honorable Conditions"; and "(b) That the Defendant received counseling for alcohol dependency during his military service[.]"

18

THE COURT: Response?

[PROSECUTOR]: Your Honor, I'm not offering this to show propensity of evidence. I'm offering this because [defense counsel] has opened the door in several ways. One, he's the one that's talked about how this gentleman has 60 percent disability and that's why he can't work. I think since he's claimed he's disabled, I should be able to explore what that disability is.

Second, with regard to his service in the military, [defense counsel] asked him to give him a history of his service with the military and then he conveniently stopped with his last assignment. And I think I'm entitled, since he's opened the door, to ask for a history of his military assignments. I'm entitled to go in and – and go through his separation from the military, the reasons for his separation from the military, since that door has been opened.

And in addition, I think it goes towards his state of mind with regard to the time that this child was injured.

[DEFENSE COUNSEL]: I think the prejudicial effect grossly outweighs any probative value this evidence might have.

THE COURT: I'm gonna overrule the objection.

The prosecutor then elicited testimony regarding Defendant's discharge from the military. Defendant testified that he received a "general" discharge "under honorable conditions," but not an "honorable discharge" because he failed to complete inpatient substance abuse treatment. Without objection, the prosecutor asked whether Defendant had sought to change his discharge status and had written a letter to his superior officer acknowledging "bad behavior." Defendant volunteered that he "had an alcohol-related incident on June 14th." The prosecutor asked Defendant, "What is this alcohol-related incident that you had on June 14th?" Defense counsel objected, but he did not state a legal basis for the objection. At a bench conference, the prosecutor argued that Defendant had raised the issue, to which defense counsel responded, "Object. That doesn't make it admissible into evidence, Your Honor." The trial court overruled the

19

objection. Defendant proceeded to testify that, while intoxicated in public, he got into an altercation with five teenagers.

Defendant contends that the trial court erred in overruling his objections. He specifically identifies three portions of his testimony that he alleges constituted inadmissible character or prior bad acts evidence that Defendant: (1) "got into a fight with children"; (2) "admitted to 'bad behavior' in a letter he wrote to his chain of command regarding his general discharge from the Army"; and (3) "spent 5 days in a psychiatric hospital." The State maintains that defense counsel's two objections failed to preserve any of Defendant's three allegations of error for review. We agree.

With regard to defense counsel's second objection, no grounds for the objection were stated. "Simply stating the word, 'objection,' preserves nothing for appellate review." **State v. Overton**, 261 S.W.3d 654, 666 (Mo. App. 2008). With regard to defense counsel's first objection – made when Defendant was asked whether he had been hospitalized for five days with a psychiatric condition – defense counsel stated no ground for the objection but did cross-reference "our motion in limine"; albeit, without identifying which of the seven such motions filed he was referring to. Cross-referencing a motion in limine in an objection has been found to preserve a claim of evidentiary error to the extent the objection was contained within the motion. *See* **State v. Minner**, 311 S.W.3d 313, 318 (Mo. App. 2010).[9] In this case, however, neither Defendant's motion

---

[9] The mere fact that some of Defendant's motions in limine were granted prior to trial is of no consequence because "[a] ruling in limine is interlocutory only and is subject to change during the course of the trial." **State v. Purlee**, 839 S.W.2d 584, 592 (Mo. banc 1992). As such, "[t]he motion in limine, in and of itself, preserves nothing for appeal." *Id*. at 592. Missouri courts strictly apply these principles based on the notion that trial judges should be given an opportunity to reconsider their prior rulings against the backdrop of the evidence actually adduced and in light of the circumstances that exist when the questioned evidence is actually proffered. **State v. Colenburg**, 773 S.W.2d 184, 189 (Mo. App. 1989).

pertaining to character evidence nor his motion pertaining to prior bad acts contained any reference to his hospitalization. Only one motion – which sought to exclude Defendant's medical and mental health records on the basis that they were "irrelevant" – was, arguably, applicable to defense counsel's objection. As such, the reason for error asserted on appeal – that the evidence constituted improper character and prior bad acts – is unpreserved.

> Preservation of evidentiary questions for appeal requires an objection at the time the evidence is sought to be introduced along with the same objection being carried forward on appeal. An objection to the admissibility of evidence must be specific. The purpose of this rule is to ensure that the trial court is informed of the reasons of the objection so that it can thereby make a reasoned and informed ruling. Any grounds that are not raised in the objection are considered waived, and a party is prevented from raising such grounds for the first time on appeal. Changing the grounds for the objection or broadening the grounds is also prohibited.

*State v. Hoy*, 219 S.W.3d 796, 809 (Mo. App. 2007) (citations omitted).

As mentioned previously, we may review for plain error in our discretion. *See* Rule 30.20; *Edberg*, 185 S.W.3d at 293. The first step in that process is to determine whether the trial court committed evident, obvious and clear error affecting the defendant's substantial rights. *Mack*, 301 S.W.3d at 95. Based upon our review of the record, the trial court did not commit any error, plain or otherwise, in admitting the challenged testimony.

"When a party inquires into part of an act, occurrence, or transaction they have 'opened the door' to testimony regarding that act, occurrence, or transaction, and the opposing party is entitled to inquire into other parts of it in order to rebut possible inferences that may be drawn from an incomplete version presented by the adversary or to prove the party's own version of events." *State v. Newsom*, 299 S.W.3d 784, 789 (Mo. App. 2009); *State v. Tisius*, 362 S.W.3d 398, 409 (Mo. banc 2012). In addition,

21

when a defendant injects an issue into the case, the State may be allowed to admit otherwise inadmissible evidence to explain or counteract a negative inference raised by the issue injected. *State v. Bryant*, 362 S.W.3d 46, 51 (Mo. App. 2012). The testimony elicited during Defendant's cross-examination that he challenges here stemmed directly from his testimony on direct in which he outlined: (1) his military service, apparently to cast him in a favorable light; and (2) his disability due to post-traumatic stress disorder, apparently to garner sympathy from the jury. As such, Defendant "opened the door" to further questioning on those issues. *See Tisius*, 362 S.W.3d at 409. Further, the evidence concerning the fight with the teenagers was elicited after Defendant volunteered that he had an alcohol-related incident on June 14th that led to his being ordered into an in-patient rehabilitation program. A defendant may not complain about matters that he himself brings into the case. *See State v. Collier*, 892 S.W.2d 686, 691-92 (Mo. App. 1994) (no abuse of discretion in allowing inquiry into defendant's juvenile probation after the defendant volunteered the information that he was on probation and had prior juvenile problems). Therefore, the trial court's admission of the challenged portions of Defendant's testimony was not an abuse of discretion, much less a plain error. Point VII is denied.

### *Point VIII*

In Point VIII, Defendant contends that the trial court erred in failing to grant a mistrial in response to a question that the State posed during its examination of Defendant. The following facts are relevant to this point.

On direct examination, Defendant testified that he and Mother married shortly after Victim's death. He then testified on cross-examination that Mother was living in Washington with their daughter. On redirect, defense counsel inquired:

Q. [DEFENSE COUNSEL] Is – was [Mother] – is – is [Mother] available too if the State had wanted to call her as a witness?

A. [DEFENDANT] I can't speak for [Mother].

Q. Is she – was she an endorsed witness by the State?

A. No, she was not.

Q. Is she at an address where she could have been produced and brought to this Court by the State if they wanted to?

A. Yes, she is.

[DEFENSE COUNSEL]: I have no further questions.

THE COURT: Recross?

RECROSS-EXAMINATION BY [PROSECUTOR]:

Q. Well, except, Mr. Evans, there's that little thing called marital privilege, right?

[DEFENSE COUNSEL]: Objection, Your Honor. That's not the law and this Court knows it. And I would ask for a curative instruction. [Prosecutor] knows this. If it has to do with abuse, there is no marital privilege, period. That's the law.

[PROSECUTOR]: They're claiming there's no abuse, Your Honor.

[DEFENSE COUNSEL]: There is no abuse, but there sure is an allegation of one or we wouldn't be wasting our – we wouldn't be here.

[PROSECUTOR]: I'll – I'll withdraw –

THE COURT: Is there a question here?

[PROSECUTOR]: I'll withdraw my question, Your Honor.

THE COURT: I'll sustain the objection. Okay. Anything further?

[PROSECUTOR]: No, ma'am.

THE COURT: Anything further?

[DEFENSE COUNSEL]: No further questions, Your Honor.

Defense counsel did not request a mistrial until the following day, after the defense had rested its case. It is counsel's responsibility to request a mistrial. *State v. Hendrix*, 883 S.W.2d 935, 945 (Mo. App. 1994). If counsel fails to do so, it will be assumed that counsel is satisfied with the measures taken by the trial court. *Id*. A subsequent request for a mistrial or other additional measures is untimely. *Id*. Here, Defendant waited until after the close of his case before requesting a mistrial, thereby rendering his request untimely. Therefore, our review, if any, is for plain error pursuant to Rule 30.20. *See Mack*, 301 S.W.3d at 95.

Defendant claims error in refusing to grant the requested mistrial in that the prosecutor's question "improperly poisoned the jury" against Defendant by suggesting Defendant married Mother to prevent her from testifying against him. We disagree. Even if we assume that the complained-of question was improper, which we do not, Defendant must show that the prosecutor's question had a decisive effect on the jury's verdict in order to carry his burden of establishing facial plain error. *State v. Tripp*, 168 S.W.3d 667, 678-79 (Mo. App. 2005); *State v. Hightower*, 951 S.W.2d 712, 717 (Mo. App. 1997). In this case, the question was withdrawn before any answer was given by Defendant. "Questions are not evidence, and even improper questions are generally not prejudicial if left unanswered." *State v. Huffman*, 445 S.W.3d 76, 81 (Mo. App. 2014). This is especially true in this case where the jury had received MAI-CR 3d 302.02, which states in pertinent part, that "[a] question is not evidence, and may be considered only as it supplies meaning to the answer." *Id*.; *see State v. Lloyd*, 205 S.W.3d 893, 908 (Mo. App. 2006); *State v. Wilson*, 888 S.W.2d 744, 748 (Mo. App. 1994). We presume that the jury properly followed the trial court's instructions in rendering its verdict. *State v.*

*Chavez*, 128 S.W.3d 569, 578 (Mo. App. 2004). Defendant cites to nothing in the record that suggests otherwise.

Because Defendant has failed to demonstrate that the trial court committed evident, obvious and clear error affecting his substantial rights, our inquiry ends. *Mack*, 301 S.W.3d at 95. Point VIII is denied.

*Point VI*

In Point VI, Defendant contends that the trial court erred in not granting a mistrial on the basis that the State "was allowed to mischaracterize a key fact" during closing argument regarding comments made by Defendant to a 911 dispatcher. The following facts are relevant to this point.

A recording of the 911 call at issue, Exhibit PP, was played for the jury during Defendant's case-in-chief. This exhibit was not offered or admitted in evidence. Defense counsel told the trial court that he had a transcript of that recording. This transcript was not offered or admitted in evidence.

During the State's closing argument, the prosecutor said:

How do we know what's happened to this child? It's best summed up in the Defendant's own words when he calls 911.

(A PORTION OF DEFENDANT'S EXHIBIT PP WAS PLAYED TO THE JURY.)

[PROSECUTOR]: Best said by the Defendant himself. He's alone with this child for a period of hours. We know that the child had been clingy and he wouldn't listen to the Defendant.

The prosecutor also had a transcript of the 911 call, which was shown to the jury as a demonstrative aid while Exhibit PP was being played. The State's transcript was not offered or admitted in evidence.

25

During Defendant's closing argument, defense counsel said that the prosecutor misquoted the 911 call by saying the Victim "wasn't listening" to Defendant. Defense counsel played a portion of Exhibit PP for the jury again and displayed his version of the transcript to the jury. He argued that the recording actually said Victim "wouldn't" listen to Defendant.

After the jury returned its guilty verdicts, Defendant filed a motion for a mistrial on the ground that the prosecutor had misstated in closing argument what Defendant said during the 911 call. The trial court denied the motion.

On appeal, Defendant contends the trial court erred by denying the motion for mistrial. Defense counsel, however, did not move for a mistrial during the prosecutor's closing argument. Instead, he waited until after the jury returned its guilty verdicts to make that request. Consequently, Defendant's claim is not preserved for review. *See State v. Lingle*, 140 S.W.3d 178, 190 (Mo. App. 2004).

Improper comments made by the State during closing argument that are not preserved by a timely objection can only be reviewed for plain error pursuant to Rule 30.20. *State v. Payne*, 126 S.W.3d 431, 444 (Mo. App. 2004). "Statements made in closing argument rarely constitute plain error." *Lloyd*, 205 S.W.3d at 908. When such statements are made without objection and request for relief, "a trial court's uninvited interference with summation may itself constitute error." *Id*. "Counsel's failure to object may have been intentional for reasons of trial strategy, or the comment may have been unimportant enough to merit an objection." *Id*. Plain error review requires a showing that the prosecutor's comments had a decisive effect on the jury's verdict. *Id*.

Defendant has failed to make the requisite showing. Assuming *arguendo* that Defendant did state that Victim "wasn't listening," as he contends, we fail to see the

26

import. The State has wide latitude in drawing reasonable inferences from the evidence during closing argument. ***State v. Cannady***, 389 S.W.3d 306, 310 (Mo. App. 2013). As such, whether Defendant said that Victim "wasn't listening" or "wouldn't listen," the State's suggested inference – that Defendant hurt Victim after becoming frustrated with him – was reasonable. Moreover, the jury was given multiple opportunities to listen to the disputed portion of the 911 recording, which was also played during Defendant's closing argument in an apparent effort to rebut the State's inference.[10] Thus, the challenged comment could not have had a decisive effect on the verdict where the jurors had ample opportunity to discern for themselves what Defendant actually said.

Because Defendant has failed to demonstrate that the trial court committed evident, obvious and clear error affecting his substantial rights, our inquiry ends. ***Mack***, 301 S.W.3d at 95. Point VI is denied.[11]

*Point X*

In Point X, Defendant contends that the trial court erred because it did not allow the jury to view the 911 transcript or listen to the audio recording during deliberations. The following additional facts are relevant to this point.

After the jury had retired to deliberate, the trial court received a note from the jury requesting to see "all evidence in this case." The trial court conferred with counsel to

---

[10] After having again played the disputed portion of Exhibit PP for the jury, defense counsel argued: "Okay. He wasn't listening to me. It's not that he won't listen to me. Again, as if that would matter, but in – that is symptomatic of how solid the State's entire case is."

[11] Defendant also complains that, during closing argument, the State referenced a 2011 article that was not in evidence. We do not address this argument as it was not raised before the trial court, either by way of his motion for a mistrial or his motion for a new trial, and Defendant cannot now broaden his objection on appeal. *See **Hoy***, 219 S.W.3d at 809.

27

determine which exhibits had been admitted into evidence. All such evidence was then sent to the jury room. Defense counsel made no specific mention of the 911 recording (Exhibit PP) or either transcript of that recording. None of these items had been offered or admitted in evidence.

About an hour later, the following occurred:

THE COURT: We have a – another note from the jury. We would like to see the 911 transcript, signed, I think, by whoever the foreperson is and dated. I mean, you're welcome to come up and take a look.

I always like – I don't think it's particularly confident. We don't have a transcript in evidence as far as I know, so typically I will not send back anything like that. They have to go on the evidence that they have. So, State, any position?

[PROSECUTOR]: I agree with you, Judge.

THE COURT: Okay.

[DEFENSE COUNSEL]: I –

THE COURT: [Defense Counsel]?

[DEFENSE COUNSEL]: I agree.

The trial court sent the jury a note advising it that it had received all of the evidence that had been admitted.

Defendant complains that the trial court erred in denying the jury's request to see the 911 transcript. This claim lacks merit for multiple reasons. Here, the record reflects that neither transcript of the 911 call was admitted into evidence. The trial court, therefore, may have itself committed error had it granted the jury's request to see the transcripts. *See **State ex rel. Koster v. McElwain***, 340 S.W.3d 221, 255 (Mo. App. 2011). Moreover, defense counsel expressly agreed with the trial court that the 911 transcripts had not been admitted into evidence and should not be sent to the jury.

Affirmatively acquiescing to an action by the trial court waives even plain error review. *See **State v. Johnson***, 284 S.W.3d 561, 582 (Mo. banc 2009).

Defendant's point also contends the court should have let the jury hear Exhibit PP, the 911 audio recording, during deliberations. This argument likewise fails. The disputed portion of Exhibit PP was played for the jury during closing argument. The jury's note only asked to see "the 911 transcript[.]" The trial court denied this request because neither transcript had been offered or admitted in evidence. Defense counsel agreed with the trial court's decision that the 911 transcripts should not be sent to the jury room, and he made no request that the jury instead be allowed to listen again to Exhibit PP during deliberations. During the argument relating to the motion for mistrial, defense counsel acknowledged that "we didn't insist that the recording be sent back … because, I mean, there is some offensive language on my client's part." By affirmatively acquiescing to the trial court's action, even plain error review was waived. *See **id**.* Point X is denied.

*Point IX*

In Point IX, Defendant alleges that the State intimidated Mother to keep her from testifying. Defendant bases this allegation on Mother's testimony during Defendant's sentencing hearing, wherein, responding to questions by defense counsel, Mother indicated that she had felt intimidated by the State. Based upon this testimony, defense counsel orally requested a new trial, which the trial court later denied. Defendant now contends that this was error because "the actions of the State left [Defendant] with the choice of whether or not to seek to call [Mother] as a witness" thereby shifting the burden of proof to Defendant.

29

Defendant's allegation was not raised in a timely motion for new trial; therefore, the allegation is not preserved for our review. *State v. Young*, 230 S.W.3d 30, 32 (Mo. App. 2007). In any event, Defendant does not contend that he was denied the opportunity to call Mother as a witness. Defendant's argument, instead, focuses on *the failure of the State* to call Mother as a witness, but cites no authority supporting the proposition that this somehow shifted the burden of proof.[12] When an argument is made without citation to any authority and no explanation is provided for the absence of authority, as is the case here, the point is deemed waived or abandoned. *State v. Wadlow*, 370 S.W.3d 315, 321 n.6 (Mo. App. 2012). Moreover, Defendant's argument belies the fact that defense counsel, apparently for strategic reasons, actively sought to highlight during the guilt phase of Defendant's trial that the State had failed to call Mother as a witness.[13] Defendant "cannot seek plain error review arising from failed tactical and strategic decisions made at trial." *State v. Turner*, 242 S.W.3d 770, 779 (Mo. App. 2008). Point IX is denied.

The judgment and sentence of the trial court is affirmed.

JEFFREY W. BATES, J. – OPINION AUTHOR

DANIEL E. SCOTT, J. – CONCUR

WILLIAM W. FRANCIS, JR., C.J./P.J. – CONCUR

---

[12] Contrary to Defendant's suggestion, we note that the State "has no obligation to call all witnesses known to it, and this is true even though the prosecution may have endorsed the name of the person in question upon the information as a potential witness." *State v. Lansford*, 594 S.W.2d 617, 622 (Mo. banc 1980).

[13] *See* Point VIII, *supra*. Defense counsel also referenced the failure of the State to call Mother as a witness during closing argument. This elicited an objection from the State on the basis that it was improper for defense counsel to comment on who the State calls or does not call as a witness. In response, defense counsel asserted that his argument was proper in that he was commenting on the "failure of the State to prove their case." Ultimately, the trial court overruled the State's objection.